## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC.,         ) | |
|                                ) | |
|                Plaintiff,    ) | |
|                                ) | |
|                  v.        ) | Civil Action No: 1:10-cv-01834 (PLF) |
|                                ) | |
| NATIONAL ARCHIVES AND    ) | |
| RECORDS ADMINISTRATION,    ) | |
|                                ) | |
|             Defendant.    ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
## MOTION TO DISMISS

# TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    I.      Statutory Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

          A.      Historical Context. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

          B.      The Presidential Records Act of 1978.. . . . . . . . . . . . . . . . . .  6

    II.     Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    III.   Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    I.      PLAINTIFF LACKS STANDING BECAUSE IT HAS NOT ALLEGED
          A REDRESSABLE INJURY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

          A.      The Court Cannot Compel NARA to Assume Custody and
                 Control of the Audiotapes, Because the PRA Does Not Mandate
                 It.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

          B.      The Court Cannot Compel NARA to Seize the Audiotapes,
                 Because Any Remedies Available Under the PRA Are
                 Committed Solely to NARA's Discretion... . . . . . . . . . . . . . .  15

    II.     THE PRA PRECLUDES JUDICIAL REVIEW OF PLAINTIFF'S
          CLAIM UNDER THE APA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

          A.      The D.C. Circuit's *Armstrong* Decisions Have Already
                 Determined That Plaintiff's APA Claim is Precluded by the
                 PRA... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

            1.     The *Armstrong* Decisions.. . . . . . . . . . . . . . . . . . . . . . . 19

            2.     Plaintiff's Lawsuit Here is Precluded By the *Armstrong* Decisions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     B.    The PRA Precludes a Private Litigant From Challenging the President's Classification of a Particular Record as Personal.. 25

III.    PLAINTIFF'S LAWSUIT IS PREMATURE BECAUSE NARA HAS NOT UNDERTAKEN A FINAL AGENCY ACTION.. . . . . . . . . . . . 30

IV.    PLAINTIFF HAS FAILED TO STATE A CLAIM BECAUSE EVEN TAKING ALL ALLEGED FACTS AS TRUE, NARA DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN UPHOLDING PRESIDENT CLINTON'S CLASSIFICATION OF THE AUDIOTAPES AS PERSONAL RECORDS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## CASES

*Am. Fed'n of Gov't Employees, AFL-CIO v. O'Connor*,
    747 F.2d 748 (D.C. Cir. 1984). ........................................................................ 32

*Armstrong v. Bush* [*Armstrong I*],
    924 F.2d 282 (1991)........................................... 2, 4, 6, 14, 15, 18, 19, 20, 23, 24

*Armstrong v. Exec. Office of the President* [*Armstrong II*],
    1 F.3d 1274 (D.C. Cir. 1993). .............................................................. 21, 22, 24

*Armstrong v. Exec. Office of the President* [*Armstrong III*],
    90 F.3d 553 (D.C. Cir. 1996). ........................................................................ 22

*Armstrong v. Bush*,
    721 F. Supp. 343 (D.D.C. 1989). ............................................... 6, 20, 22, 23, 25

*Armstrong v. Bush*,
    139 F.R.D. 547 (D.D.C. 1991). ................................................................ 20, 21

*Baltimore Gas & Elec. Co. v. FERC*,
    252 F.3d 456 (D.C. Cir. 2001). ...................................................................... 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007). .......................................................................... 10, 33, 37

*Bennett v. Spear*,
    520 U.S. 154 (1996). ...................................................................................... 31

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984). .................................................................................. 25, 30

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988). ...................................................................................... 31

*CREW v. Cheney*,
    593 F. Supp. 2d 194 (D.D.C. 2009). ........................................................ 12, 24

*CREW v. Office of Admin.*,
    559 F. Supp. 2d 9 (D.D.C. 2008). .................................................................. 17

*CREW v. Dep't of Homeland Sec.*,
    527 F. Supp. 2d 101 (D.D.C. 2007). ........................................................... 3, 24

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971). ............................................................................. 33

*Claybrook v. Slater*,
    111 F.3d 904 (D.C. Cir. 1997). ........................................................ 16

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006). ............................................................................. 10

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997). ........................................................ 10

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990). ............................................................................. 11

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992). ............................................................................. 31

*Heckler v. Chaney*,
    470 U.S. 821 (1985). ............................................................... 15, 16, 17

*Kenney v. Dep't of Justice*,
    603 F. Supp. 2d 184 (D.D.C. 2009). ............................................... 31

*Kissinger v. Reporters Comm. for Freedom of the Press*,
    445 U.S. 136 (1980). ...................................................................... 14, 32

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1991). ............................................................................. 10

*Massachusetts v. EPA*,
    549 U.S. 497 (2007). ............................................................................. 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983). ............................................................................... 34

*Newdow v. Roberts*,
    603  F.3d 1002 (D.C. Cir. 2010). ................................................. 11, 18

*Nixon v. Adm'r of GSA,*
    433 U.S. 425 (1977). .............................................................................. 5, 26, 27

*Nixon v. Freeman,*
    670 F.2d 346 (D.C. Cir. 1982). ....................................................................... 5, 6

*Nixon v. United States,*
    978 F.2d 1269 (D.C. Cir. 1992). ......................................................................... 5

*Norton v. S. Utah Wilderness Alliance,*
    542 U.S. 55 (2004). ............................................................................... 12, 13, 14

*Pub. Citizen v. Carlin,*
    2 F. Supp. 2d 1 (D.D.C. 1997). ........................................................................ 24

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
    324 F.3d 726 (D.C. Cir. 2003). ......................................................................... 32

*Rempfer v. Sharfstein,*
    583 F.3d 860 (D.C. Cir. 2009). ......................................................................... 11

*Russello v. United States,*
    464 U.S. 16 (1983). ........................................................................................... 26

*Sec'y of Labor v. Twentymile Coal Co.,*
    456 F.3d 151 (D.C. Cir. 2006). ......................................................................... 16

*Swift v. United States,*
    318 F.3d 250 (D.C. Cir. 2003). ......................................................................... 16

*Switchmen's Union of North America v. Nat'l Mediation Bd.,*
    320 U.S. 297 (1943). ........................................................................................ 13

*United States v. McElvenny,*
    No. 02-3027, 2003 WL. 1741422 (S.D.N.Y. April 1, 2003). ............................ 14

*United States v. Mead Corp.,*
    533 U.S. 218 (2001). ........................................................................................ 37

## STATUTES

5 U.S.C. § 552. ........................................................................................................ 9

5 U.S.C. § 701. ................................................................................... 2, 15, 18

5 U.S.C. § 704 ........................................................................................... 31

5 U.S.C. § 706. ........................................................................................... 12

28 U.S.C. § 516. ......................................................................................... 14

44 U.S.C. § 2111. .................................................................................... 5, 26

44 U.S.C. § 2112. ...................................................... 8, 9, 13, 16, 25, 30

44 U.S.C. §§ 2201-2207. .......................................................................... 1, 6

44 U.S.C. § 2201. ........................................... 1, 7, 22, 34, 35, 36, 37

44 U.S.C. § 2203  ................................................................................... 6, 7, 13

44 U.S.C. § 2204. ............................................................................. 25, 27, 28

44 U.S.C. § 2904. ................................................................................... 4, 17

44 U.S.C. § 2905. ................................................................................... 4, 13

44 U.S.C. § 3101. ........................................................................................ 4

44 U.S.C. § 3106. ................................................................................... 4, 13

44 U.S.C. §§ 3315-3324. ........................................................................... 5

## MISCELLANEOUS

H.R. Rep. No. 95-1487, *reprinted in* 1978 U.S.C.C.A.N. 5732. ................................. 27

*To Amend the Freedom of Information Act to Insure Public Access to the Official Papers of the President, and for Other Purposes: Hearings Before the Subcomm. on Gov't Information and Individual Rights of the H. Comm. on Gov't Operations*, 95th Cong. (1978)....................................................................................... 28, 29

*To Amend Title 44 to Insure the Preservation and Public Access to the Official Records of the President, and for Other Purposes: Hearing on S. 3494 Before the S. Comm. on Gov't Affairs*, 95th Cong. (1978)............................................................. 29

**INTRODUCTION**

Plaintiff Judicial Watch, Inc., purporting to enforce the Presidential Records Act of 1978 (PRA), 44 U.S.C. §§ 2201-2207, requests that this Court order the National Archives and Records Administration (NARA) to physically seize the personal audio diary of former President Clinton.  This extraordinary request is unfounded, contrary to the PRA's express terms, and contrary to traditional principles of administrative law.  Even taking all factual allegations in the complaint as true, the requested audio diary is a "personal record" as defined by the PRA, 44 U.S.C. § 2201(3)(A), and therefore is not subject to any governmental control.  But even assuming for purposes of this motion that the audio diary in question could be considered a presidential and not personal record, NARA has complete discretion as to when to pursue the recovery of presidential records not in its possession.  And because NARA has this absolute discretion over when to initiate enforcement proceedings, courts cannot order NARA to seize particular records when NARA has exercised its discretion not to do so.

This Court's inability to issue such an order is fatal to Plaintiff's lawsuit. Plaintiff's *only* alleged injury is a lack of access to President Clinton's audio diary.  *See* Compl. at ¶21.  To remedy that injury, Plaintiff asks this Court, in part, to "order [NARA] to assume custody and control of" President Clinton's audiotapes. Compl. at 5. But this Court cannot provide such a remedy, and therefore is unable to redress Plaintiff's injury.  Plaintiff's complaint, consequently, should be dismissed for lack of standing.

The above analysis assumes, moreover, that Plaintiff even has a cognizable cause of action under the Administrative Procedure Act (APA)—which it does not. The PRA is a statute that "preclude[s] judicial review" under the APA, 5 U.S.C. § 701(a)(1), as the D.C. Circuit's decisions in the *Armstrong* cases confirm. Indeed, the D.C. Circuit already has rejected attempts by private litigants to obtain "judicial review of the President's general compliance with the PRA," which is precisely what Plaintiff seeks to accomplish here. *Armstrong v. Bush*, 924 F.2d 282, 291 (1991) [hereinafter *Armstrong I*]. Moreover, even apart from the *Armstrong* decisions, the PRA's text, structure, purpose, and history all confirm that the PRA precludes judicial review for the particular decision that Plaintiff is challenging here—NARA's determination that President Clinton properly classified particular records as "personal" rather than "presidential."

Yet another threshold issue requires that Plaintiff's lawsuit be dismissed: Plaintiff's purported APA challenge fails to identify any final agency action. Prior to this lawsuit, Plaintiff pursued President Clinton's audiotapes under the Freedom of Information Act (FOIA). NARA rejected Plaintiff's FOIA request on the ground that NARA did not have custody over President Clinton's tapes. NARA then went on to state that, based on the facts provided by Plaintiff, the audiotapes were President Clinton's personal records, and thus would not be subject to FOIA even if they were in NARA's custody. Plaintiff now seizes on this language from NARA's letter and characterizes it as a final agency determination regarding the PRA claim presented here. That argument is untenable; NARA's discussion of the audiotapes was solely in

the context of a FOIA appeal, and did not have any legal consequences under the PRA. Thus, there is no final agency action for this Court to review with respect to Plaintiff's PRA claim.

Finally, even were the Court to conclude that judicial review is available and that NARA made a final determination as to Plaintiff's PRA claim, the Court should still dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted. Even taking all of Plaintiff's factual allegations as true, NARA correctly upheld President Clinton's classification of the audiotapes as personal records. NARA considered all of the relevant factors and properly explained its decision, which amply demonstrates that NARA did not act arbitrarily or capriciously. NARA's significant institutional expertise with respect to presidential records also entitles its decision to a measure of deference, which Plaintiff's allegations do not overcome. Thus, Plaintiff's complaint should be dismissed.

## BACKGROUND

### I.   Statutory Framework

#### A.   Historical Context

Although Plaintiff's lawsuit is based solely on the Presidential Records Act, two of the PRA's predecessor statutes are also important to this case.

First, the Federal Records Act (FRA) is "a series of statutes that collectively govern the creation, management, and disposal of records by federal agencies." *Citizens for Responsibility & Ethics in Washington (CREW) v. Dep't of Homeland Sec.*, 527 F. Supp. 2d 101, 108 (D.D.C. 2007); *see* 44 U.S.C. §§ 2101-18, 2901-09, 3101-07,

3301-24.  Under the FRA, "[t]he head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]"  44 U.S.C. § 3101.

The Archivist of the United States—who is the head of NARA—plays an important role in administering the FRA.  Specifically, the Archivist "shall provide guidance and assistance to Federal agencies," *id.* § 2904(a), and "may inspect the records or the records management practices and programs of any Federal agency," *id.* § 2906(a)(1).  Additionally, an agency head may not dispose of any records without the approval of the Archivist.  *See id.* §§ 3303a, 3314.

The FRA also creates an administrative enforcement scheme, by which the Archivist and an agency head must notify each other if one of them learns "of any actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of the agency[.]" *Id.* §§ 2905(a), 3106.  The agency head, with the assistance of the Archivist, must then "request that the Attorney General initiate an action to prevent the destruction of documents" or to recover unlawfully removed documents.  *Armstrong I*, 924 F.2d at 294.  If the agency head refuses to make that request, then the Archivist must "notify Congress and independently request that the Attorney General initiate an action[.]" *Id.*

This administrative enforcement scheme is exclusive.  Thus, courts may not order the recovery or retrieval of records that may have been removed or destroyed.  *See id.* ("Because it would clearly contravene this system of administrative enforcement

to authorize private litigants to invoke federal courts to prevent an agency official from improperly destroying or removing records, we hold that the FRA precludes judicial review of such actions.").

The second predecessor statute to the PRA is the Presidential Recordings and Materials Preservation Act of 1974 (PRMPA), *see* note following 44 U.S.C. § 2111. Prior to the PRMPA, presidential records were "treated as the President's private property." *Nixon v. United States*, 978 F.2d 1269, 1284 (D.C. Cir. 1992). In 1974, however, Congress became concerned that former President Nixon might destroy records relating to the Watergate investigation. *See id.* at 1271. Accordingly, Congress passed the PRMPA, which instructed the General Services Administration (GSA)—at the time the parent agency of the National Archives—to seize President Nixon's records, and to promulgate regulations providing for public access to those records. *See* note following 44 U.S.C. § 2111 at §§ 101, 104. President Nixon challenged the PRMPA's constitutionality, but the Supreme Court upheld the PRMPA's facial validity, and the D.C. Circuit upheld the PRMPA's implementing regulations. *See Nixon v. Adm'r of GSA*, 433 U.S. 425 (1977); *Nixon v. Freeman*, 670 F.2d 346 (D.C. Cir. 1982).

The PRMPA, by its terms, applied only to President Nixon's records. But Title II of the PRMPA created a "National Study Commission on Records and Documents of Federal Officials" to make recommendations to Congress and the President on, among other things, whether or not the records of Presidents should be subject to federal law. *See generally* 44 U.S.C. §§ 3315-3324. Accordingly, "[t]he controversy over the Nixon materials prompted subsequent congressional reconsideration of the traditional

disposition and preservation of Presidential materials.  That reconsideration resulted in the passage of the Presidential Records Act of 1978[.]" *Nixon v. Freeman*, 670 F.2d at 349 n.2.  When drafting the PRA, therefore, Congress was "acutely aware" of the PRMPA and the litigation surrounding it.  *Armstrong v. Bush*, 721 F. Supp. 343, 350 (D.D.C. 1989), *overruled on other grounds by Armstrong I*, 924 F.2d at 282.

### B.      The Presidential Records Act of 1978.

The Presidential Records Act of 1978, 44 U.S.C. §§ 2201-2207, commonly known as the PRA, creates a scheme governing the preservation and disclosure of presidential records, which applies to all Presidents starting with President Reagan.  During a President's time in office, the PRA directs the President "to take all such steps as may be necessary to assure that" presidential records are created and maintained pursuant to the PRA.  *Id.* § 2203(a).

Unlike the FRA, however, the PRA contemplates a limited role for the Archivist during a President's time in office.  Indeed, "the PRA accords the President virtually complete control over his records during his term of office.  Although the President must notify the Archivist before disposing of records and the Archivist may inform Congress of the President's desire to dispose of the records, neither the Archivist nor the Congress has the authority to veto the President's disposal decision." *Armstrong I*, 924 F.2d at 290.

Once a President's time in office has concluded, the Archivist receives the presidential records, and deposits them in a presidential archival depository, commonly

referred to as a presidential library. *See* 44 U.S.C. § 2203(f). The Library must then begin processing and organizing the records to provide for public access. *Id.*

Most presidential records become available to the public beginning five years after the President leaves office, either through FOIA requests or when the Library has processed the records. *See id.* § 2204(b)(2) & (c)(1). For certain categories of information, however, the President, prior to leaving office, may "specify durations, not to exceed 12 years, for which access shall be restricted[.]" *Id.* § 2204(a). During that period, the Archivist, after consulting with the former President, determines whether a particular presidential record falls within one of the restricted categories. *Id.* § 2204(b)(3). The Archivist's decision is not subject to judicial review, unless "the former President assert[s] that a determination made by the Archivist violates the former President's rights or privileges." *Id.* § 2204(e).

Importantly to this case, the PRA's preservation and disclosure provisions apply only to *presidential* records—not personal records. In its definition of "presidential records," the PRA specifically excludes the President's "personal records." *See id.* § 2201(2)(B) ("The term 'Presidential records' . . . does not include any documentary materials that are . . . personal records[.]"). And the term "personal records" is in turn defined as including, among other things, "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business." *Id.* § 2201(3)(A). A former President's diary or its functional equivalent, therefore, is specifically excluded from the definition of a presidential record.

-7-

The PRA requires the President, "to the extent practicable," to "categorize[]" materials as presidential records or personal records "upon their creation or receipt" and to "file[] [them] separately."  *Id.* § 2203(b).  It then directs the Archivist of the United States to "assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President" upon the conclusion of a President's term in office.  *Id.* § 2203(f)(1).  The PRA contains no provision compelling the Archivist to assume responsibility for, or to review, the materials that the President "categorized" and "filed separately" as personal records.

Finally, with respect to enforcement, the PRA grants the Archivist the authority to invoke the same enforcement mechanism embodied in the FRA:

> When the Archivist considers it to be in the public interest, he may exercise, with respect to papers, documents, or other historical materials deposited under this section, or otherwise, in a Presidential archival depository, *all the functions and responsibilities otherwise vested in him pertaining to Federal records* or other documentary materials in his custody or under his control.

44 U.S.C. § 2112(c) (emphasis added).  Although that language was originally passed as part of the Presidential Libraries Act of 1955—yet another predecessor statute to the PRA—the PRA amended § 2112(c) to specifically apply to presidential records as well.  *See id.* (stating that "[o]nly the first two sentences of this subsection," which includes the sentence quoted above, "shall apply to Presidential records").

## II.    Factual Background

Plaintiff Judicial Watch alleges that "[d]uring the course of his presidency, President Clinton enlisted historian Taylor Branch to assist President Clinton in

creating an oral history of his eight years in office."  Compl. at ¶8.  That oral history, Plaintiff says, was recorded on a number of audiotapes.  *Id.* at ¶9.

On October 7, 2009, Plaintiff sent a request to the Clinton Presidential Library, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeking copies of the Taylor Branch audiotapes.  *See* Compl. at ¶12.  The Clinton Presidential Library denied that request.  *Id.* at ¶13.

On November 2, 2009, Plaintiff appealed that denial to NARA.  *Id.* at ¶14.  On March 16, 2010, NARA, through Deputy Archivist Adrienne C. Thomas, rejected Plaintiff's FOIA appeal.  *Id.* at ¶15.  Ms. Thomas explained that the requested audio tapes "are not and have never been physically located at the Clinton Library or at any other NARA facility[.]" *See* Ex. 4 at 2 (Letter from Adrienne C. Thomas to Michael Bekesha).  That was the end of Ms. Thomas's FOIA analysis, though she then went on to explain why, based "[o]n the facts made available to me, I do not believe the materials in question fall within the ambit of the PRA."  Specifically, Ms. Thomas stated that she was "of the opinion that the audio tapes . . . are personal records of President Clinton[.]" *Id.*

Plaintiff thereafter filed this lawsuit, bringing one claim under the APA, 5 U.S.C. § 701, *et seq.*  Plaintiff's claim asserts that NARA arbitrarily and capriciously labeled the audio tapes personal records, Compl. at ¶20, and that classifying the tapes as personal is "irreparably harm[ing]" Plaintiff by "prevent[ing] Plaintiff from gaining access to the audiotapes through FOIA."  Compl. at ¶21.  Thus, Plaintiff asks this Court for a number of remedies: to declare NARA's classification of the records as

personal to be arbitrary and capricious; to declare that the tapes are presidential records; to order NARA to assume custody and control of the tapes; to order NARA to deposit the tapes in the Clinton Presidential Library; and to order NARA to process the tapes under FOIA.  Compl. at 5.

## III.   Standard of Review

Defendant NARA moves to dismiss the complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Plaintiff bears the burden of showing subject-matter jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1991).  Indeed, it is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (internal quotation marks omitted).

NARA also moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  In evaluating the sufficiency of the complaint, the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Although a court must accept all factual allegations as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation[.]"  *Id.* (internal quotation marks omitted).

## ARGUMENT

## I.   PLAINTIFF LACKS STANDING BECAUSE IT HAS NOT ALLEGED A REDRESSABLE INJURY.

For Plaintiff to establish constitutional standing, a jurisdictional requirement, it "must show an injury in fact that is fairly traceable to the challenged conduct and that will likely be redressed by a favorable decision on the merits." *Rempfer v. Sharfstein*, 583 F.3d 860, 868 (D.C. Cir. 2009).  A plaintiff's articulation of its injury is limited to the allegations in the complaint.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("[P]etitioners in this case must allege facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing." (internal quotations and alterations omitted)).

Here, Plaintiff's sole articulation of its injury is that NARA is "prevent[ing] Plaintiff from gaining access to the audiotapes through FOIA."  Compl. at ¶21. Plaintiff's own complaint admits, however, that NARA does not currently possess the audiotapes.  *See id.* at ¶16 ("On information and belief, President Clinton unlawfully retained the requested audiotapes after leaving office.").

To redress Plaintiff's injury, then, this Court would have to compel NARA to seize the audiotapes from President Clinton—and indeed, that is precisely the relief that Plaintiff seeks.  *See id.* at 5 (requesting the Court to "order Defendant to assume custody and control of the requested records").  That relief is unavailable, however, and thus Plaintiff's injury is not redressable by this Court.  *See Newdow v. Roberts*, 603

F.3d 1002, 1013 (D.C. Cir. 2010) (denying standing because "[t]he only apparent avenue of redress for plaintiffs' claimed injuries . . . is unavailable").

### A.    The Court Cannot Compel NARA to Assume Custody and Control of the Audiotapes, Because the PRA Does Not Mandate It.

Plaintiff's requested relief here is quite remarkable.  Plaintiff seeks to compel NARA to seize materials from a former President of the United States, even though the former President presumably considers those materials to be personal records. Plaintiff makes that request, moreover, without identifying any clear basis for it.  That lack of specificity is not by accident:  No provision in the PRA requires NARA to "assume custody and control" of President Clinton's audiotapes.

Plaintiff's lawsuit is actually one under the APA, purporting to enforce the terms of the PRA.  This APA lawsuit was Plaintiff's only option, because the PRA itself does not provide Plaintiff with a private right of action.  *See CREW v. Cheney*, 593 F. Supp. 2d 194, 218 (D.D.C. 2009).  Plaintiff does not specify which provision of the APA is the basis for its requested relief, but for its injury to be redressed, it would have to proceed under 5 U.S.C. § 706(1), which allows a court "to compel agency action unlawfully withheld."

For Plaintiff to obtain relief under that provision, however, Plaintiff must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) [hereinafter *SUWA*] (emphasis in original).  As the Court explained in *SUWA*, prior to the APA judicial review of agency action was achieved mostly through writs of mandamus.  The

APA "carried forward [that] traditional practice[,]" and thus the APA—like mandamus—is "limited to enforcement of a 'specific, unequivocal command[.]'" *Id.* at 63.  For Plaintiff to succeed on its APA claim, then, it must show that the PRA contains a "specific, unequivocal command" directing NARA to seize all presidential records.

Plaintiff cannot make that showing.  The PRA does not require NARA to physically seize presidential records, but instead relies upon a much more limited (and sensible) administrative enforcement scheme.  As discussed above, the PRA allows the Archivist of the United States, "[w]hen the Archivist considers it to be in the public interest," to invoke the FRA's enforcement scheme.  44 U.S.C. § 2112(c).  And under the FRA's scheme, "the Archivist shall request the Attorney General to initiate" an action for the recovery of missing records, and "shall notify the Congress when such a request has been made."  *See id.* §§ 2905(a), 3106.

This administrative enforcement scheme is the exclusive method by which NARA can recover records under the PRA.[1]  As the Supreme Court has long held, "it is for Congress to determine how the rights which it creates shall be enforced. . . . [T]he specification of one remedy normally excludes another."  *Switchmen's Union of*

_____

[1] 44 U.S.C. § 2203(f) does not require NARA to physically seize any records, presidential or personal.  That subsection requires the Archivist, when a President leaves office, to "assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President," to deposit them in a federal facility, and to make them available to the public.  That subsection presupposes the existence of a departing President's collection of presidential records—"*the* Presidential records of *that* President"—and requires the Archivist to assume responsibility for that specific collection.  In drafting this subsection, Congress surely knew that, just a few sentences earlier, it had directed the President to file personal records separately from this collection of presidential records.  *Id.* § 2203(b).  Tellingly, § 2203(f) does not reference these personal records or require the Archivist to take any action with respect to them.

-13-

*North America v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943).  Indeed, the D.C.

Circuit already has concluded that the FRA's enforcement scheme is exclusive.  *See*

*Armstrong I*, 924 F.2d at 294; *see also Kissinger v. Reporters Comm. for Freedom of the*

*Press*, 445 U.S. 136, 149 (1980) ("Congress expressly recognized the need for devising

adequate statutory safeguards against the unauthorized removal of agency records,

and opted in favor of a system of administrative standards and enforcement.").

Moreover, NARA—the agency charged with administering this provision—treats this

enforcement mechanism as exclusive for both the PRA and the FRA.  And, indeed,

NARA previously has invoked this scheme to recover missing presidential materials.

*See, e.g.*, *United States v. McElvenny*, No. 02-3027, 2003 WL 1741422 (S.D.N.Y. April 1,

2003) (Department of Justice lawsuit in the form of a civil replevin action, seeking

recovery of a map of Cuba annotated by President Kennedy during the Cuban Missile

Crisis).

    Because the PRA relies upon this exclusive enforcement scheme—requesting the

Attorney General to institute an action for the recovery of missing records—the PRA

cannot also impose a duty on NARA to seize missing records.[2]  Without an unequivocal

duty for NARA to seize presidential records, this Court cannot order NARA to take

such action.  *See SUWA*, 542 U.S. at 63 ("[T]he only agency action that can be

compelled under the APA is action legally *required*." (emphasis in original)).  Plaintiff's

_____

[2] Congress's administrative enforcement scheme, moreover, makes good sense.  The permanent recovery of a presidential record could involve some sort of judicial proceeding, which would require the Attorney General's authorization.  *See* 28 U.S.C. § 516 (stating that all litigation on behalf of the United States and its agencies "is reserved to officers of the Department of Justice, under the direction of the Attorney General").

requested relief is unavailable, and therefore Plaintiff has not alleged a redressable injury.

**B.    The Court Cannot Compel NARA to Seize the Audiotapes, Because Any Remedies Available Under the PRA Are Committed Solely to NARA's Discretion.**

Even assuming that the PRA places a duty on NARA to seize presidential records and that the audiotapes here are presidential records, this Court still cannot order such relief.  Plaintiff is essentially asking the Court to order NARA to "enforce" the PRA against an alleged violator.  Again, this request is rather remarkable.  For one thing, the alleged violator here is a former President of the United States.  When enacting the PRA, Congress was keenly aware of "the stark separation of powers questions implicated by legislation regulating the conduct of the President's daily operations."  *Armstrong I*, 924 F.2d at 292.  It is untenable to think that Congress, mindful of such considerations, would nevertheless authorize a private litigant to compel the seizure and examination of a former President's personal records.  Such relief would, as Congress was well aware, raise serious separation of powers and privacy concerns.

But Plaintiff's requested relief suffers from a more straightforward defect as well.  Under traditional administrative-law principles, this Court cannot review NARA's decision not to enforce the PRA by seeking recovery of specific materials. Under the APA, courts cannot review "agency action [that] is committed to agency discretion by law[.]" 5 U.S.C. § 701(a)(2).  The Supreme Court interpreted this language in *Heckler v. Chaney*, 470 U.S. 821 (1985), and concluded that "an agency's

-15-

decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831. To overcome that presumption of non-reviewability, a plaintiff must show that "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 833.

Here, Plaintiff cannot point to any guidelines in the PRA instructing NARA when to seize missing records. As the D.C. Circuit has repeatedly held, this silence is conclusive. *See, e.g.*, *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157-58 (D.C. Cir. 2006) (holding that judicial review is unavailable because "the statute is 'utterly silent on the manner in which the [agency] is to proceed against a particular transgressor'" (quoting *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 461 (D.C. Cir. 2001))); *Swift v. United States*, 318 F.3d 250, 253 (D.C. Cir. 2003) (stating that judicial review is unavailable because the statute "neither sets substantive priorities nor circumscribes the government's power to discriminate among issues or cases it will pursue").

Nor can Plaintiff look outside the PRA for such criteria. The statutory provision authorizing NARA to utilize the FRA enforcement mechanism vests the Archivist with complete discretion for determining when to utilize that mechanism. *See* 44 U.S.C. § 2112(c) ("When the Archivist considers it to be in the public interest, he may . . . ."); *see also Claybrook v. Slater*, 111 F.3d 904, 908 (D.C. Cir. 1997) (holding that nearly identical language—"whenever [the agency representative] determines it to be in the public interest"—precludes review because that determination is "committed to agency

discretion"). Thus, the text of the statute makes clear that the Archivist's decision whether to initiate enforcement proceedings is unreviewable.

Moreover, the rationale underlying *Chaney* supports application of its presumption here. In *Chaney*, the Court noted that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." 470 U.S. at 831. An agency, for example, "must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, . . . whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.*

Here, NARA is a relatively small agency with limited resources. And yet NARA is tasked with an extremely difficult mission: For every federal agency, NARA must "ensur[e] adequate and proper documentation of the policies and transactions of the Federal Government and ensur[e] proper records disposition." 44 U.S.C. § 2904(a). Needless to say, then, NARA must carefully marshal its resources and prioritize its efforts; private direction of its enforcement activity would create significant disruption.[3] As the Court concluded in *Chaney*, private litigants should not be able to control an agency's budget or its agenda. *See Chaney*, 470 U.S. at 831-32; *see also*

_____

[3] Not every presidential record is necessarily worth pursuing through an enforcement proceeding. Although many presidential records are extremely historically significant, some are rather mundane, such as White House parking records maintained by the Office of Administration. *See generally CREW v. Office of Admin.*, 559 F. Supp. 2d 9 (D.D.C. 2008) (concluding that the Office of Administration, which is part of the Executive Office of the President, is not an "agency" subject to FOIA and the Federal Records Act, but is instead subject to the Presidential Records Act), *aff'd*, 566 F.3d 219 (D.C. Cir. 2009).

-17-

*Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("As we have repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.  That discretion is at its height when the agency decides not to bring an enforcement action." (internal citations omitted)).

At bottom, the PRA wisely sets no limits on NARA's enforcement discretion.  Thus, NARA's view that the requested audio diary is a personal record and its decision not to seek possession of it through an enforcement action is not reviewable.  Again, because the Court cannot order NARA to pursue such an action, Plaintiff's only alleged injury—a lack of access to President Clinton's audiotapes—cannot be redressed by this Court.  Plaintiff has failed to carry its burden to show that it has standing, and therefore the complaint should be dismissed for lack of subject-matter jurisdiction.  *See Newdow*, 603 F.3d at 1013 (denying standing because "[t]he only apparent avenue of redress for plaintiffs' claimed injuries . . . is unavailable").

## II.   THE PRA PRECLUDES JUDICIAL REVIEW OF PLAINTIFF'S CLAIM UNDER THE APA.

Even apart from Plaintiff's lack of standing, this lawsuit must be dismissed because the PRA precludes judicial review of Plaintiff's APA claim.  *See* 5 U.S.C. § 701(a)(1) (stating that the APA applies "except to the extent that . . . statutes preclude judicial review").  Two independent reasons compel this conclusion.

First, the D.C. Circuit's *Armstrong* decisions have already held that Plaintiff's APA claim is precluded.  *See Armstrong I*, 924 F.2d at 291 ("We therefore hold that the

PRA precludes judicial review of the President's recordkeeping practices and decisions."). Second, the PRA's text, history, structure, and purpose all confirm that private litigants are precluded from challenging the President's classification of a record as personal under the PRA.

> **A.      The D.C. Circuit's *Armstrong* Decisions Have Already Determined That Plaintiff's APA Claim is Precluded by the PRA.**

Binding precedent has already determined that "the PRA is one of the rare statutes that does impliedly preclude judicial review." *Armstrong I*, 924 F.2d at 290. Indeed, the type of review that the D.C. Circuit rejected in that case—"judicial review of the President's general compliance with the PRA at the behest of private litigants"—is precisely the review that Plaintiff requests here. *Id.* at 291; *see* Compl. at ¶16 (alleging that "President Clinton unlawfully retained the requested audio-tapes"). Because such review is precluded, Plaintiff's complaint must be dismissed.

> **1.      The *Armstrong* Decisions.**

The D.C. Circuit's *Armstrong* decisions all involve a lawsuit alleging that then Presidents Ronald Reagan and George H.W. Bush, among other defendants, "intend[ed] to delete material from the White House computer systems in violation of the FRA and PRA." *Armstrong I*, 924 F.2d at 286. Specifically, the *Armstrong* plaintiffs sought access to emails that were stored on the National Security Council's (NSC's) computers during the Reagan administration. The defendants moved for summary judgment in the district court, which the court denied after concluding that

"judicial review of the President's compliance with the PRA is permissible under the APA[.]" *Armstrong v. Bush*, 721 F. Supp. 343, 353 (D.D.C. 1989).

On appeal, however, the D.C. Circuit reversed the district court's conclusion. After reviewing the PRA's structure and history, the Court stated: "[I]t is difficult to conclude that Congress intended to allow courts, at the behest of private citizens, to rule on the adequacy of the President's records management practices or overrule his records creation, management, and disposal decisions." *Armstrong I*, 924 F.2d at 290. The Court acknowledged that its decision left open the possibility that the PRA would not be fully enforced, but concluded that was Congress's conscious decision:

> In declining to give outsiders the right to interfere with White House recordkeeping practices, Congress presumably relied on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations. We will not second-guess that decision or upset the political compromises it entailed. Allowing judicial review of the President's general compliance with the PRA at the behest of private litigants would substantially upset Congress' carefully crafted balance of presidential control of records creation, management, and disposal during the President's term of office and public ownership and access to the records after the expiration of the President's term. We therefore hold that the PRA precludes judicial review of the President's recordkeeping practices and decisions.

*Id.* at 290-91. The *Armstrong I* Court did, however, permit plaintiffs to pursue their FRA-based claim that NSC's record-keeping guidelines inadequately defined what materials constituted federal records. *See id.* at 291.

On remand, the *Armstrong* plaintiffs amended their complaint to omit all claims based on the PRA. *See Armstrong v. Bush*, 139 F.R.D. 547, 550 (D.D.C. 1991); *see also* Ex. 5, *Armstrong v. Bush*, Civ. No. 89-0142, Mot. for Leave to File Am. Compl. & 2d

-20-

Am. Compl. at 1 ("[P]laintiffs' Second Amended Complaint, in response to the court of appeals' conclusion that judicial review of compliance with the Presidential Records Act is not available, omits plaintiffs' claims for relief under that Act."). Instead, plaintiffs pursued only their FRA- and FOIA-based claims—namely, their claim that NSC's guidelines defining "federal records" were inadequate. *See id.* at ¶20 ("NSC [has] issued guidelines . . . on records identification, management, and disposal. These guidelines . . . fail to provide adequate procedures or guidance to preserve agency records[.]"). During discovery, when plaintiffs sought access to NSC guidelines defining what constituted a "presidential record"—which was necessary to determine how NSC was defining a "federal record"—the district court, relying on *Armstrong I*, rejected plaintiffs' request:

> The Court of Appeals held that the PRA precludes judicial review of the President's recordkeeping practices and decisions. . . . While the plaintiffs' argument has some appeal—that is, a logical way to determine what the agency defines as a record under the FRA is to see what materials are excluded from that definition—it violates the clear mandate from the Court of Appeals. The plaintiffs must focus on the defendants' guidelines relating to "federal records" rather than conducting discovery on the instructions relating to "Presidential records".

*Armstrong v. Bush*, 139 F.R.D. at 551.

Plaintiffs appealed, and again the D.C. Circuit reversed. The Court re-affirmed its opinion in *Armstrong I*, but carved out a "narrow, clearly defined limitation" on the scope of the PRA's preclusion of judicial review. *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1292 (D.C. Cir. 1993) [hereinafter *Armstrong II*]. Specifically, the Court held that courts could review "guidelines defining presidential records *under*

the rubric of substantive FOIA law." *Id.* at 1292 (emphasis added).  Congress, when passing the PRA, specifically excluded records subject to FOIA from the definition of "presidential records."  *See* 44 U.S.C. § 2201(2)(B)(i).  Thus, judicial review under the rubric of substantive FOIA law was necessary to "avert[] a clash in the role of judicial review under the two statutory schemes" of FOIA and the PRA.  *Armstrong II*, 1 F.3d at 1292; *see also id.* at 1294 ("Congress expressly intended when it passed the PRA to preserve unchanged the coherent body of law that had been developed under the FOIA, and *it is that body of law* that provides the basis for our limited review of the definition of presidential records provided in the guidelines." (emphasis added)).

The holding of *Armstrong II*, therefore, is that a court, when considering FRA- or FOIA-based claims, may engage in "limited review" of "guidelines defining presidential records" to assure that those guidelines "do not improperly sweep in nonpresidential records" that would otherwise be subject to the FRA or FOIA.  *Id.* at 1278.  The *Armstrong II* decision did not, however, modify *Armstrong I*'s conclusion that courts cannot directly review a President's compliance with the PRA.  *See Armstrong v. Exec. Office of the President*, 90 F.3d 553, 556 (D.C. Cir. 1996) [hereinafter *Armstrong III*] ("[R]ecordkeeping requirements of the FRA are subject to judicial review and enforcement; those of the PRA are not.").  The *Armstrong II* panel said nothing about judicial review of stand-alone PRA claims, because that issue was not before the Court—the *Armstrong* plaintiffs, as noted above, had omitted all of their claims based on the PRA.

    2.    **Plaintiff's Lawsuit Here is Precluded By the *Armstrong* Decisions.**

As the D.C. Circuit made clear throughout the *Armstrong* litigation, the PRA precludes "judicial review of the President's general compliance with the PRA at the behest of private litigants[.]" *Armstrong I*, 924 F.2d at 291. And yet that is precisely the kind of review that Plaintiff seeks here. This Court, in evaluating whether to grant Plaintiff relief, would necessarily have to decide whether "President Clinton *unlawfully* retained the requested audiotapes," as Plaintiff alleges. *See* Compl. at ¶16 (emphasis added). Moreover, the exact same relief that Plaintiff seeks here was already rejected by the D.C. Circuit in *Armstrong I*. *Compare* Compl. at 5 (requesting the court to "declare the requested records to be presidential records"), *with Armstrong I*, 924 F.2d at 286-87 (describing plaintiffs' lawsuit as seeking, in part, a "declaration that many of the documents stored in the PROFS system . . . are presidential records"). Thus, Plaintiff's lawsuit falls within the heart of *Armstrong I*'s preclusion of judicial review.

Nothing, moreover, in *Armstrong II* allows for review of Plaintiff's lawsuit. Specifically, there are two key differences between Plaintiff's lawsuit here and the review allowed by *Armstrong II*.

First, and most fundamentally, *Armstrong II* allows for review of *guidelines* that define what constitutes a presidential record. Here, Plaintiff does not challenge any guideline or general definition of "presidential records." Instead, Plaintiff challenges the *application* of that term to these particular audiotapes. Such lawsuits are clearly outside *Armstrong II*'s provision for limited review of "guidelines defining presidential

records." 1 F.3d at 1292.[4]   Whatever *Armstrong II* might otherwise stand for, it

certainly does not open up review for Plaintiff's lawsuit here.

The second reason why *Armstrong II* does not provide for review of Plaintiff's

lawsuit is because Plaintiff's suit does not include any FRA- or FOIA-based claims.  As

discussed above, *Armstrong II* enables judicial review of guidelines defining

presidential records, but only when the plaintiff is proceeding under FRA- or FOIA-

based claims.  When a lawsuit contains only PRA claims, as does Plaintiff's suit here,

*Armstrong II* precludes review.[5]

---

[4] Even under the FRA, plaintiffs are precluded from challenging how particular documents are classified. *See Armstrong I*, 924 F.2d at 294 (holding that the FRA "preclud[es] private litigants from suing directly to enjoin agency actions in contravention of agency guidelines"); *CREW v. DHS*, 527 F. Supp. 2d at 111-12 ("The FRA . . . precludes a private action, like this one, that seeks to require agency staff to comply with the agency's record-keeping guidelines or the FRA[.]"); *Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1, 9 (D.D.C. 1997) (Friedman, J.) ("While judicial review is precluded to the extent that allegations are made that agency officials are not acting in compliance with their duties under recordkeeping guidelines, the Court has a role to play in reviewing the guidelines themselves under the APA."), *overruled on other grounds by Pub. Citizen v. Carlin*, 184 F.3d 900 (D.C. Cir. 1999).  If a particular record has been mis-classified, the only recourse is the administrative enforcement mechanism provided for by Congress.

[5] To be sure, not every court has agreed with this interpretation of *Armstrong II*. *See, e.g.*, *CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) (Kollar-Kotelly, J.).  But with all due respect to the Court, *Cheney* has three significant flaws.  First, *Cheney* reads *Armstrong II* as broadly permitting review of PRA claims.  But the *Armstrong II* Court could not have made a broad pronouncement about what type of review is available under the PRA, because that Court did not have any PRA claims before it.

Second, *Cheney* fails to acknowledge that *Armstrong II* permitted judicial review related to the PRA only "to avert[] a clash" with FOIA.  Contrary to the *Cheney* court's holding, then, it *does* matter which statute a plaintiff is proceeding under.  *See Cheney*, 593 F. Supp. 2d at 215.  And third, by narrowly construing *Armstrong I* to preclude review only of "the President's 'creation, management, and disposal decisions,'" 593 F. Supp. 2d at 214-15, the *Cheney* Court ignores the other types of decisions that the *Armstrong I* Court held were not subject to review.  *See Armstrong I*, 924 F.2d at 286-87 (plaintiffs sought "a declaration that many of the documents . . . are presidential records," and an injunction "directing the President and NSC to classify and preserve the documents as required by the FRA and PRA").

-24-

In sum, the D.C. Circuit's *Armstrong* decisions confirm that the PRA precludes judicial review of Plaintiff's lawsuit.  A necessary element of Plaintiff's suit here is reviewing whether President Clinton violated the PRA.  *Armstrong I* precludes such review, however, and nothing in *Armstrong II* alters that conclusion.  Plaintiff's lawsuit should therefore be dismissed.

**B.      The PRA Precludes a Private Litigant From Challenging the President's Classification of a Particular Record as Personal.**

Even apart from the *Armstrong* decisions, the PRA also evinces a clear intent to preclude private litigants from challenging the President's classification of a particular record as personal.  "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  Here, the PRA's text, history, structure, and purpose all confirm that private litigants are unable to challenge the President's designation of a record as personal.

First, the PRA's text supports the view that private litigants may not challenge the designation of a record as personal.  When drafting the PRA, Congress clearly knew how to provide for judicial review when it wanted to.  It did so expressly with respect to the administrative enforcement mechanism, 44 U.S.C. § 2112(c), and with respect to former Presidents' ability to assert privilege claims.  *See* 44 U.S.C. § 2204(e) ("The United States District Court for the District of Columbia shall have jurisdiction over

any action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges.").[6]  The absence of such express language in other sections of the statute, therefore, implies that Congress intended *not* to allow judicial review of those actions. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotations and alteration omitted)).  The text of the PRA, then, counsels against allowing a private litigant to challenge the President's designation of a particular record as personal.

Second, the PRA's history confirms that Congress intended to minimize intrusions on the President's personal privacy.  As alluded to earlier, the PRA was passed in the wake of the PRMPA and the litigation surrounding that statute.  One of President Nixon's key arguments in challenging the PRMPA was that it unlawfully intruded on his personal privacy because it seized his personal papers and subjected them to review.  Although the Supreme Court upheld the facial validity of the PRMPA, the Justices were highly sensitive to President Nixon's argument. *See Nixon v. Adm'r*, 433 U.S. at 459 n.22 ("[T]he Government should now promptly disclaim any interest in materials conceded to be appellant's purely private communications and deliver them to him.").  One of the Justices in the majority even wrote separately to stress that

---

[6] Congress also expressly provided for judicial review in the PRMPA. *See* note following 44 U.S.C. § 2111 at § 105.

"return of these [personal] materials should proceed without delay." *Id.* at 484 (White, J., concurring in part and concurring in the judgment).  And although the Supreme Court upheld the facial validity of the PRMPA, at the time of the PRA's passage President Nixon was still litigating the validity of the regulations promulgated to implement the PRMPA.    Thus, the precise scope of a President's privacy right—specifically his right not to have his personal papers reviewed by others—was still undefined.

Congress was well aware of this uncertainty, and sought to ensure that the PRA would not intrude on future Presidents' privacy rights.  *See, e.g.*, H.R. REP. NO. 95-1487, pt. 1, at 5-7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5737-38 [hereinafter HOUSE REPORT] (discussing the history of the Nixon materials and the Supreme Court's decision); *id.* at 11 (noting the need "to properly protect a President's privacy interests and his first amendment associational rights").  In light of this history, Congress would not have authorized private litigants to obtain judicial review of a President's determination that certain records are personal.  Congress instead left decisions about whether to recover materials in the possession of a former President (or any other individual) in the hands of the Archivist and the Attorney General.

Third, the PRA's overall structure also supports preclusion of judicial review. Yet another way the PRA protects the President's privacy is by allowing the President to restrict access to certain categories of presidential records for up to twelve years. *See* 44 U.S.C. § 2204(a).  During that restricted period, a person denied access to a record has no right to judicial review of that denial.  *Id.* § 2204(b)(3).  The President's

personal papers, by contrast, are not subject to any restricted period, because those papers are not government records and are excluded from the public disclosure requirements of the PRA. Were this Court to permit judicial review, however, it would lead to the anomalous consequence that the President's *most* sensitive papers would be *immediately* subject to judicial review. At 12:01p.m. on January 20th, as soon as the President has left office, a plaintiff would be able to file a lawsuit seeking access to the former President's diary, which may include reflections from mere moments ago. It is highly improbable that Congress, obviously concerned about the President's personal privacy, intended such a system.

That conclusion is re-enforced by the fourth relevant consideration—the purpose of the provision excluding a President's personal papers from government control. By giving each President complete control over his personal papers, Congress hoped that it would encourage Presidents to create and preserve such papers, and that Presidents would later voluntarily donate those papers to the National Archives. As Representative Brademas, one of the PRA's co-sponsors, explained: "We also hope that, in protecting materials such as purely personal diaries from mandatory disclosure, we will encourage their creation in the first instance and keep alive the possibility of a voluntary gift of these materials." *To Amend the Freedom of Information Act to Insure Public Access to the Official Papers of the President, and for Other Purposes: Hearings Before the Subcomm. on Gov't Information and Individual Rights of the H. Comm. on Gov't Operations*, 95th Cong. 72 (1978) [hereinafter *House Hearings*].

-28-

Senator Nelson, one of the Act's co-sponsors in the Senate, shared this view: "It is hoped that allowing former Presidents considerable leeway in the definition of 'personal records' will encourage those Presidents to make available those records after a reasonable length of time." *To Amend Title 44 to Insure the Preservation and Public Access to the Official Records of the President, and for Other Purposes: Hearing on S. 3494 Before the S. Comm. on Gov't Affairs*, 95th Cong. 2 (1978) [hereinafter *Senate Hearings*]. Moreover, this philosophy was espoused by many prominent witnesses during the hearings on the PRA.[7] And indeed this approach has been vindicated, as shown by the donation of President Reagan's personal diary to NARA's Reagan Library.

In light of this philosophy, it is implausible to think that Congress would have permitted judicial review over a President's personal papers. Knowing that private litigants could challenge the designation of personal records would almost certainly deter a President from creating those records in the first place. And understandably so—most people, let alone public figures, would balk at the prospect of having to defend their diary in court. Judicial review, therefore, is inconsistent with the purpose underlying the PRA's personal papers provision.

---

[7] *See, e.g.*, *House Hearings* at 389-90 (statement of Daniel J. Boorstin, Librarian of Congress); *id.* at 210-11 (statement of Arthur Schlesinger, Jr., Professor of Humanities, City University of New York). This view was also embraced by the influential report written by the National Study Commission on Records and Documents of Federal Officials, produced in the wake of the dispute over the Nixon materials. *See House Hearings* at 445-46 ("Because of their great historical value, every encouragement should be offered to the President to preserve [personal] materials, and to make them publicly available.").

At bottom, the Congress of 1978 did not intend for private litigants to be able to pursue judicial review over a President's decision that certain records are personal. The PRA's text implicitly precludes judicial review, and the history preceding the PRA shows that Congress was extremely concerned about future Presidents' privacy rights. Moreover, judicial review would be extremely intrusive, particularly because it could occur immediately after a President's term ended.  Such review would undoubtedly discourage Presidents from creating or preserving personal records in the first place, which is the very opposite of Congress's desired goal.  For all of these reasons, this Court should dismiss Plaintiff's lawsuit, because the PRA precludes private litigants from challenging a President's classification of certain records as personal.[8]

## III.    PLAINTIFF'S LAWSUIT IS PREMATURE BECAUSE NARA HAS NOT UNDERTAKEN A FINAL AGENCY ACTION.

Even assuming that some measure of judicial review were available under the PRA, the particular facts of this case make review inappropriate.  Specifically, NARA has not yet undertaken a final agency action.  The letters that form the basis of this suit were responses to Plaintiff's FOIA request, and do not represent a final agency

---

[8] To be clear, the above preclusion arguments would not affect a court's ability to decide a lawsuit instituted by the Attorney General for the recovery of a presidential record.  That lawsuit, as discussed above, is expressly provided for in the PRA.  *See* 44 U.S.C. § 2112(c); *see also supra* Part I.A. Obviously, Congress cannot impliedly preclude something that it provided for expressly.  Moreover, it is not uncommon for Congress to preclude some people from bringing an action, but not others.  *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) ("[W]e must examine this statutory scheme to determine whether Congress precluded all judicial review, and, if not, whether Congress nevertheless foreclosed review to the class to which the respondents belong." (internal alterations and quotations omitted)).

determination regarding the PRA claim at issue here.  Judicial review, therefore, would be premature.

Under the APA, a plaintiff may obtain judicial review only of "final agency action[.]"  5 U.S.C. § 704.  To constitute "final agency action," an agency's action must have two characteristics: the action "must mark the consummation of the agency's decisionmaking process;" and the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1996) (internal quotation marks omitted).  Agency action "is not final if it is only the ruling of a subordinate official, or tentative."  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

Here, Plaintiff alleges that "Defendant's March 16, 2010 determination was a final agency action for which there is no other adequate remedy in a court of law."  Compl. at ¶19.  The March 16th determination was the letter that NARA sent to Plaintiff, stating that NARA was denying Plaintiff's FOIA appeal.  *See* Ex. 4 (Letter from Deputy Archivist Adrienne C. Thomas to Michael Bekesha).

To be sure, that letter constituted final agency action with respect to Plaintiff's FOIA request.  But Plaintiff is obviously not pursuing a FOIA claim here.[9]  Plaintiff is instead pursuing this APA claim, which requires Plaintiff to characterize the letter

---

[9] In Plaintiff's prayer for relief, Plaintiff does ask for an order requiring NARA "to process the records pursuant to FOIA," and for "attorney's fees and other litigation costs pursuant to" the FOIA statute. Compl. at 5.  Such relief is unavailable in this lawsuit, however, because those forms of relief are available under FOIA itself.  Thus, they cannot be pursued under the APA.  *See Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *Kenney v. Dep't of Justice*, 603 F. Supp. 2d 184, 190 (D.D.C. 2009) (Friedman, J.).

as a different type of final agency action—a final determination regarding the PRA issues raised in this lawsuit.

A close reading of the letter, however, reveals that it does not meet either test for finality. As an initial matter, the letter did not alter any rights or obligations or create any legal consequences—at least not with respect to the PRA claim. The letter was sent as a response to a FOIA appeal, and as soon as NARA stated that it did not possess the records, that was sufficient to end the FOIA matter. *See Kissinger*, 445 U.S. at 152 (holding that "possession or control [of records] is a prerequisite to FOIA disclosure duties"). Whatever language came afterwards could not, by definition, affect any legal rights or consequences, because the only legal question presented by the letters had already been resolved. Thus, NARA's opining about the status of the audiotapes did not have any legal consequences, which means it was not final agency action. *See Am. Fed'n of Gov't Employees, AFL-CIO v. O'Connor*, 747 F.2d 748, 753 (D.C. Cir. 1984) (Ginsburg, R.B., J.) ("No precedent known to us sanctions court review of such nonbinding advisory expositions.").

Moreover, NARA's letter does not represent the consummation of its decision-making process with respect to Plaintiff's PRA claim here. Plaintiff's letters to NARA were written solely within the context of a FOIA claim, and that is what NARA responded to. Plaintiff did not argue, nor did NARA consider, the precise PRA claim presented here—namely, that the PRA requires NARA to assume custody and examine President Clinton's audiotapes, because those tapes are potential presidential records. Plaintiff is still free to raise that argument to NARA, and thus judicial review at this

-32-

stage would be premature. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732-33 (D.C. Cir. 2003) ("So long as [Plaintiff] retains the opportunity to convince the agency that [the agency should take a certain action], it makes no sense for a court to intervene.").

NARA's letter from March 16, 2010 represents a final agency action for only one type of claim—a FOIA claim. NARA's additional comments about the status of the audiotapes did not directly affect any legal obligations, and did not represent the consummation of NARA's decisionmaking process. Thus, Plaintiff's lawsuit is premature because there is no final agency action for this Court to review.

## IV.   PLAINTIFF HAS FAILED TO STATE A CLAIM BECAUSE EVEN TAKING ALL ALLEGED FACTS AS TRUE, NARA DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN UPHOLDING PRESIDENT CLINTON'S CLASSIFICATION OF THE AUDIOTAPES AS PERSONAL RECORDS.

Even if the Court decides that Plaintiff has overcome all of the threshold barriers to review, Plaintiff's complaint should still be dismissed on the merits for failure to state a claim. Nothing in the complaint takes Plaintiff's right to relief beyond the "speculative level." *Twombly*, 550 U.S. at 555. Even assuming that all of Plaintiff's factual allegations are true, NARA correctly upheld President Clinton's classification of the audiotapes as personal records. Thus, NARA could not have acted arbitrarily or capriciously.

Under the APA, the "arbitrary and capricious" standard of review is a narrow one. A court may not "substitute its judgment for that of the agency," and ultimately may reverse only if the agency has committed "a clear error of judgment." *Citizens to*

-33-

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  As long as the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action," the agency has not acted arbitrarily or capriciously.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As Plaintiff's complaint states, the definition of "presidential records" includes "documentary materials created by the President 'in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  Compl. at ¶5 (quoting 44 U.S.C. § 2201(2)).  Specifically exempted from that definition, however, are a President's personal records.  *See* 44 U.S.C. § 2201(2)(B) ("Such term [presidential records] does not include . . . personal records[.]").  Thus, even if the contents of a personal record relate to the President's official duties, that record remains a personal one.  As relevant here, the PRA defines "personal records" to expressly include "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business[.]" *Id.* § 2201(3)(A).

The relevant question here, therefore, is not whether the requested audiotapes relate to President Clinton's official duties as President.  That inquiry is irrelevant if the audiotapes are validly classified as personal records.  Instead, the relevant questions are whether the audiotapes are "the functional equivalent of a diary" and whether the tapes were "prepared or utilized for, or circulated or communicated in the course of, transacting Government business."

-34-

As for the first question, NARA properly concluded that the audiotapes are the functional equivalent of a diary. As Plaintiff's own complaint alleges, President Clinton's goal was to "creat[e] an oral history of his eight years in office." Compl. at ¶8. Accordingly, President Clinton recorded his "thoughts and commentary on contemporaneous events and issues he was facing as president[.]" *Id.* at ¶9. The audiotapes, according to Plaintiff, include things like "President Clinton contemplating potential changes to his cabinet" and "President Clinton's thoughts and reasoning behind foreign-policy decisions[.]" *Id.* at ¶¶11(a), 11(b).

A person's thoughts, commentary, contemplations, and reasoning are precisely the kinds of things that one would expect to find in a diary. And indeed that is what NARA's letter concluded:

> It seems self-evident that the President was interested in compiling information for use, at his discretion, in personal endeavors following his presidency. Indeed, you assert, by citing to Mr. Branch's book, that the audio tapes were a way for President Clinton to explain, during his "post-presidency," his reasoning behind much of his policy-making and decision making. This seems to suggest that President Clinton's intent was to use the audio tapes as memory joggers about major initiatives and historical events that occurred while he was in office, akin to "diaries, journals or other personal notes."

Ex. 4 at 2 (Letter from Deputy Archivist Adrienne C. Thomas to Michael Bekesha). This passage satisfactorily explains NARA's reasoning for why the tapes are the functional equivalent of a diary.

The fact that the audiotapes may occasionally include President Clinton's side of telephone conversations does not change this conclusion. NARA acknowledged that issue, too, and likewise addressed it directly: "[W]hile the audio tapes sometimes

-35-

record President Clinton's statements and actions in response to telephone calls with local and national leaders, there is no evidence to suggest that the tapes were circulated to anyone or relied on for policy determinations of the Clinton administration." Ex. 4 at 2.  Because the tapes themselves were never used as part of President Clinton's official duties, NARA properly concluded that the tapes retained their personal character.  A contrary interpretation—that any diary recording official events suddenly becomes a presidential record—would transform a sanctuary that Congress carefully constructed into an empty sieve.  NARA's conclusion makes good sense, and cannot be described as a clear error in judgment.

As for the second question—whether the tapes were "prepared or utilized for, or circulated or communicated in the course of, transacting Government business," 44 U.S.C. § 2201(3)(A)—nowhere does Plaintiff allege that the tapes were, in fact, prepared for transacting government business, utilized for conducting government business, circulated in the course of transacting government business, or communicated in the course of transacting government business.  Plaintiffs do allege that the tapes contain content relating to government business—but that is not enough to take them outside of the carefully crafted exception for diaries.  NARA addressed this issue and explained the basis for its decision.  *See* Ex. 4 at 2 (considering whether the audiotapes "were created with the intent of their use as government materials, and whether or not they were circulated within the Administration or relied on as policy documents," and concluding that "there is no suggestion that [the tapes] were circulated or relied on for final decisions, or ever intended to be maintained by the

-36-

White House Office of Records Management"). Again, this explanation goes far beyond satisfactory, and is hardly a clear error in judgment.

Finally, any doubt on these questions must be resolved in NARA's favor based on the deference owed to NARA—the agency charged with administering the PRA. Indeed, NARA has significant institutional expertise with respect to presidential records and personal records of Presidents; NARA and its predecessor agencies have been operating presidential libraries since the 1940s. Thus, NARA's interpretation of the term "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal," 44 U.S.C. § 2201(3)(A), is entitled to significant deference. *See generally United States v. Mead Corp.*, 533 U.S. 218 (2001). Plaintiff's allegations cannot overcome the deferential review that this Court must give to NARA's conclusion about the status of the audiotapes.

Even assuming that all of the facts in Plaintiff's complaint are true, and that NARA's letter constituted a final agency decision, Plaintiff's right to relief does not rise above the "speculative level[.]" *Twombly*, 550 U.S. at 555. In upholding President Clinton's classification of the tapes as personal records, NARA properly considered all of the relevant factors, adequately explained its decision, and did not commit a clear error in judgment. NARA did not, therefore, act arbitrarily or capriciously, and Plaintiff's complaint should be dismissed for failure to state a claim.

## CONCLUSION

For all the foregoing reasons, Plaintiff's complaint should be dismissed for lack of subject-matter jurisdiction, or, in the alternative, for failure to state a claim upon which relief can be granted.

Dated:  January 3, 2011                    Respectfully submitted,

                                           TONY WEST
                                           Assistant Attorney General

                                           RONALD C. MACHEN JR.
                                           United States Attorney

                                           */s/ Elizabeth J. Shapiro*
                                           ELIZABETH J. SHAPIRO
                                           D.C. Bar Number 418925
                                           Deputy Branch Director
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave. NW
                                           Washington, DC 20530
                                           Tel.    (202) 514-5302
                                           Fax     (202) 616-8470
                                           Elizabeth.Shapiro@usdoj.gov

                                           *Attorneys for Defendant*