## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————— ) | |
| JUDICIAL WATCH, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 10-1834 (ABJ) |
| ) | |
| NATIONAL ARCHIVES AND ) | |
| RECORDS ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |
| ————————————————) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Judicial Watch, Inc. brings this action against defendant National Archives and Records Administration ("NARA") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* Plaintiff asks the Court to declare audiotapes created by former President William Jefferson Clinton and historian Taylor Branch during the Clinton administration to be "Presidential records" under the Presidential Records Act ("PRA"), 44 U.S.C. § 2203(f), and to order defendant "to assume custody and control" of them and deposit them in the Clinton Presidential Library. Plaintiff contends that defendant has acted arbitrarily and capriciously under the APA by failing to exercise control over the audiotapes and by not making them available in response to a Freedom of Information Act ("FOIA") request. Defendant has moved to dismiss [Dkt. # 6] under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted.

The Court will grant the motion to dismiss pursuant to Rule 12(b)(1) because plaintiff's claim is not redressable. NARA does not have the authority to designate materials as "Presidential records," NARA does not have the tapes in question, and NARA lacks any right,

duty, or means to seize control of them.  In other words, there has been no showing that a remedy would be available to redress plaintiff's alleged injury even if the Court agreed with plaintiff's characterization of the materials.  Since plaintiff is completely unable to identify anything the Court could order the agency to do that the agency has any power, much less, a mandatory duty, to do, the case must be dismissed.

## I.     BACKGROUND

### A.  Factual Background

According to plaintiff, President Clinton enlisted historian Taylor Branch to assist him in creating "an oral history of his eight years in office."  Compl. ¶ 8.  In 2009, Branch published a book entitled, "The Clinton Tapes:  Wrestling History with the President," based upon extensive conversations with President Clinton during his tenure in the White House and the events Branch observed when he was in the President's office.  *See* Joe Klein, "Book Review:  Bill Session," N.Y. Times (Sept. 25, 2009), http://www.nytimes.com/2009/09/27/books/review/Klein-t.html.  In 2010, plaintiff filed this action.  [Dkt. #1].  Plaintiff avers that from January 20, 1993 to January 20, 2001, Branch recorded seventy-nine audiotapes that "preserved not only President Clinton's thoughts and commentary on contemporaneous events and issues he was facing as president, but, in some instances, recorded actual events such as presidential telephone conversations."  Compl. ¶ 9.

Based on Branch's book, plaintiff contends that the recordings captured a verbatim record of President Clinton *being* President – performing his duties by engaging in conversations while Branch happened to be there with the tape recorder running – as opposed to simply

reflecting *about* the ongoing Presidency with the writer.[1]   The gravamen of the complaint, then, is that the tapes should have been included among the Presidential records transferred to the Archivist of the United States at the end of the Clinton presidency, but President Clinton retained them in his personal possession when he left office, and defendant is unable to produce them now.  Compl. ¶ 16.  The parties agree that the audiotapes are not currently in the government's possession.  Mot. to Dismiss Unedited Hr'g Tr. ("Tr.") at 5:14–18, 28:19–29:2 (Oct. 14, 2011).  And the former President is not named as a party in this action.

### B.  The Presidential Records Act of 1978

Enacted in the wake of controversy surrounding the disposition of President Richard M. Nixon's Presidential records, the Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201– 2207 (2006), governs the preservation and disclosure of Presidential records.  The PRA defines "Presidential records" as:

> [D]ocumentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect

---

1       The complaint alleges that the tapes captured a wide range of presidential matters, including:

- "potential changes to his cabinet, including whether to fire CIA Director R. James Woolsey, Jr. and whether to nominate Madeleine Albright for Secretary of State;"
- "foreign-policy decisions such as the United States' military involvement in Haiti and the contemplated relaxation of the United States' embargo in Cuba;"
- "President Clinton's side of telephone conversations with foreign leaders, members of the United States Senate, and cabinet secretaries;"
- "President Clinton speaking to several members of the United States Senate in which President Clinton attempted to persuade the Senators to vote against a specific amendment before the Senate;"
- "President Clinton's side of a telephone conversation with Congressman William Natcher of Kentucky in which President Clinton explained his reasoning for entering into the North American Free Trade Agreement based on technical forecasts that he received during presidential briefings;"
- "President Clinton's side of a telephone conversation with U.S. Secretary of State Warren Christopher concerning a diplomatic impasse over Bosnia."  Compl. ¶ 11.

upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2). The statute provides that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records," *id.* § 2202, and it directs the President to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records," *id.* § 2203(a).

The PRA distinguishes Presidential records from "personal records," defining personal records as "all documentary materials, or any reasonably segregable portion thereof, of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201(3). The PRA provides that "diaries, journals or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Governmental business" should be treated as personal records. *Id.* § 2201(3)(A). The PRA requires that all materials produced or received by the President, "to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt and be filed separately." *Id.* § 2203(b).

The categorization of the records during the Presidency controls what happens next: at the conclusion of the President's term, the Archivist is directed to "assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." *Id.* § 2203(f)(1). The Archivist is required to "make such records available to the public as rapidly and completely as possible consistent with the provisions of [the PRA]." *Id.* The statute assigns the Archivist no role with respect to personal records once the Presidency concludes.

As another court in this district has observed, "[t]he PRA incorporates an assumption made by Congress (in 1978) that subsequent Presidents and Vice Presidents would comply with the Act in good faith, and therefore Congress limited the scope of judicial review and provided little oversight authority for the President and Vice President's document preservation decisions."   *CREW v. Cheney*, 593 F. Supp. 2d 194, 198 (D.D.C. 2009).   Indeed, the PRA permits the President to dispose of any Presidential records that "no longer have administrative, historical, informational, or evidentiary value" after notifying the Archivist of the United States and designated members of Congress of the proposed disposal.  44 U.S.C. § 2203(c),(d).

The PRA provides the Archivist with authority to invoke the same enforcement mechanism found in another statute, the Federal Records Act ("FRA").  The PRA provides:

> When the Archivist considers it to be in the public interest, he may exercise, with respect to papers, documents, or other historical materials deposited under this section, or otherwise, in a Presidential archival depository, all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control.

44 U.S.C. § 2112(c).  In addition, the FRA grants the Archivist authority to:

> notify the head of a Federal agency of any actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of the agency that shall come to his attention, and assist the head of the agency in initiating action through the Attorney General for the recovery of records wrongfully removed and for other redress provided by law.

44 U.S.C. § 2905(a).

### C. Procedural Background

Plaintiff Judicial Watch, Inc. is a non-profit organization that "seeks to promote transparency, integrity, and accountability in government and fidelity to the rule of law."  Compl. ¶ 3.  In order to fulfill those goals, plaintiff "regularly requests access to the public records of federal, state, and local government agencies, entities, and offices, and disseminates its findings

to the public." *Id.*  Defendant NARA is a governmental agency charged with the safekeeping of documents and materials created in the course of business by the United States Federal government that have particular legal or historical value.  *Id.* ¶ 4; *About the National Archives*, *National Archives*, http://www.archives.gov/about (last visited Feb. 28, 2012).   Defendant operates and maintains the Clinton Presidential Library and Museum ("the Clinton Library"), which contains the Presidential records of President Clinton.  Compl. ¶ 4.

   1.   Plaintiff's FOIA Request

On October 7, 2009, plaintiff sent a FOIA request to the Clinton Library seeking access to the seventy-nine tapes recorded by Branch.  Compl. ¶ 12; Ex. 1 to Def.'s Mot. to Dismiss. Plaintiff received a letter in response from Dana Simmons, Supervisory Archivist for the Clinton Library, dated October 9, 2009, stating that the requested tapes "are not [P]residential records and therefore are not subject to request under the PRA and FOIA."   Compl. ¶ 13 (internal quotations omitted); Ex. 2 to Def.'s Mot. to Dismiss.  The letter went on to state that "the tapes are personal records, as defined in section 2201(3) of the PRA."  Ex. 2 to Def.'s Mot. to Dismiss.

On November 2, 2009, plaintiff appealed the determination that the tapes were not Presidential records on the grounds that the tapes "clearly relate to or have effect upon the official duties of President Clinton."   Ex. 3. to Def.'s Mot. to Dismiss; Compl. ¶ 14.   NARA denied the appeal on March 16, 2010.  Ex. 4 to Def.'s Mot. to Dismiss.  In a letter to plaintiff from Adrienne C. Thomas, Deputy Archivist of the United States, NARA provided the following explanation:

> In response to your appeal, first, and most importantly, the Taylor Branch audio tapes are not and have never been physically located at the Clinton Library or at any other NARA facility, and thus your FOIA request is premised on a faulty assumption that these materials are somehow within the present custody of the National Archives – which they are not.

*Id.* The letter went on to say:

> To the extent, however, that your FOIA appeal can be read as requesting that the National Archives should make a further determination that the materials in question ought to be considered "presidential records" within the meaning of the PRA, we decline to do so. In making a decision on this matter I have to consider the nature of the audio tapes, if they were created with the intent of their use as government materials, and whether or not they were circulated within the Administration or relied on as policy documents. On the facts made available to me, I do not believe the materials in question fall within the ambit of the PRA.
>
> ***
>
> For these reasons, I am of the opinion that the audio tapes created by Taylor Branch are personal records of President Clinton as defined by the PRA.

*Id.*

### 2.   The Lawsuit Before the Court

Plaintiff filed this action on October 28, 2010. The complaint alleges one count under the APA, 5 U.S.C. § 701, *et seq.* Plaintiff avers that defendant took final agency action under the APA on March 16, 2010, when it determined that the audiotapes were not Presidential records, and that the determination was "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the PRA." Compl. ¶¶ 19–20. Plaintiff alleges that it has been irreparably harmed by the decision that the tapes were not Presidential records because that classification "prevents [p]laintiff from gaining access to the audiotapes through FOIA." *Id.* ¶ 21.

In its prayer for relief, the complaint asks the Court to (1) declare defendant's action to be arbitrary, capricious, an abuse of discretion, and in violation of the PRA; (2) declare the audiotapes to be Presidential records under the PRA; (3) order defendant to "assume custody and control" of the audiotapes; (4) order defendant to deposit the audiotapes at the Clinton Library; (5) order defendant to process the records pursuant to FOIA; and (6) grant plaintiff's attorney's fees and litigation costs as well as any other appropriate relief. *Id.* at 5–6 (prayer for relief).

Defendant moved to dismiss [Dkt. # 6] pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction on the grounds that plaintiff has not alleged a redressable injury and therefore lacks standing.  Def.'s Mem. in Support of Mot. to Dismiss at 11–18.  Defendant also moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, arguing that the PRA precludes judicial review of plaintiff's claim under the APA, and that there has been no final agency action.  *Id.* at 18–37.

## II.    STANDARD OF REVIEW

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citations omitted).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

### A.  Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibly Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court with limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  Because "subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the

parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, a court "may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction in the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B. Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' 'that the pleader is entitled to relief.'" *Id.* at 1950, quoting Fed. R. Civ. P. 8(a)(2). A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a

cause of action," *id.* at 1949, quoting *Twombly*, 550 U.S. at 555, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*  In ruling upon a motion to dismiss, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice."  *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

## III.   ANALYSIS

### A.  Whether Judicial Review Is Available Under the Presidential Records Act

Plaintiff asks the Court to utilize the APA to review a determination it claims the defendant made under the PRA that the audiotapes were personal, and not Presidential, records. [2] Tr. at 37.  Defendant takes the position that plaintiff's claim based is precluded because the D.C.

---

[2]    Plaintiff insists that it is not challenging President Clinton's classification of the audiotapes as personal, but rather defendant's "erroneous decision the audiotapes are not presidential records."  Pl.'s Opp. at 11–12.  This is at odds with paragraph 16 of the complaint, which specifically alleges that the President retained the tapes and did not transmit them to the Archivist as part of his Presidential records at the conclusion of his presidency – in other words, that it was *his* decision.  But plaintiff's confusion was engendered, at least in part, by the Deputy Archivist's decision to express an opinion in the course of denying the FOIA appeal:  "To the extent, however, that your FOIA appeal can be read as requesting that the National Archives should make a further determination that the materials in question ought to be considered '[P]residential records' within the meaning of the PRA, we decline to do so . . . . On the facts made available to me, I do not believe the materials in question fall within the ambit of the PRA."  Ex. 4 to Def.'s Mot. to Dismiss.
    In the Court's view, plaintiff reads too much into this statement.  Under the statutory scheme established by the PRA, the decision to segregate personal materials from Presidential records is made by the President, during the President's term and in his sole discretion, *see* 44 U.S.C. § 2203(b), so the Deputy Archivist could not and did not make a classification decision that can be challenged here.  When she posited that perhaps the plaintiff was asking NARA "to make a *further* determination that the materials in question *ought* to be considered '[P]residential records,'" she was, if anything, as counsel for the defendant suggested at the hearing, opining on the question of whether there were grounds for the Archivist to choose to invoke the enforcement mechanism embodied in the statute.  Tr. at 8; 23–24.  But, neither plaintiff nor defendant believes that is a decision that is at issue in this lawsuit, *see id.,* at 8–9, 37, 42, and 50, and, as is discussed below, such a decision would not be reviewable in any event.

Circuit determined in *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ("*Armstrong I*"), and *Armstrong v. Bush*, 1 F.3d 1274 (D.C. Cir. 1993) ("*Armstrong II*"), that judicial review is not available under the PRA except in narrow circumstances not present in this case.  Def.'s Mem. in Support of Mot. to Dismiss at 30.  Putting aside for the moment the question of whether it was the defendant that made the determination, the question of whether a court can review a records classification decision under the PRA is not as open and shut as either side suggests.  In the *Armstrong* decisions, the court was not presented with – and did not rule upon – the question of the availability of judicial review over a decision to deem a record to be private and not presidential.  So, the *Armstrong* decisions do not control the outcome here.  But in light of the parties' joint insistence that the precedents have implications for this case, and their clashing and ultimately incomplete readings of the decisions, the Court will address them here.

      1.  The *Armstrong* Decisions

      In *Armstrong I,* a group of researchers and historians filed a lawsuit to prohibit President George H.W. Bush from erasing material stored on the White House computer systems during the last two weeks of the Reagan Administration.  *Armstrong v. Bush*, 721 F. Supp. 343, 347 (D.D.C. 1989).  The plaintiffs sought:  (1) a declaration that the documents at issue, which had been stored on a back-up computer system, were federal and presidential records under the FRA and the PRA; (2) an injunction prohibiting the destruction of these documents; and (3) an order directing the government to classify and preserve the documents as required by the FRA and the PRA.  *Id.*

      The district court determined that under the APA, a court could review the President's compliance with the PRA and the FRA.  *Id.* at 348.  ("[T]he APA empowers a private plaintiff to seek judicial review of presidential performance under these statutes.").  On appeal, the D.C.

Circuit reversed, holding that the PRA precluded judicial review of the "President's recordkeeping practices and decisions" because such judicial review "would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns." *Armstrong I*, 924 F.2d at 290–91. The court deferred to the legislature's balancing of two competing policy goals: on one hand, the "public ownership of presidential records and ensur[ing] the preservation of presidential records for public access after the termination of a President's term in office;" and on the other hand, "minimiz[ing] outside interference with day-to-day-operations of the President and his closest advisors and [] ensur[ing] executive branch control over presidential records during the President's term in office." *Id.* at 290. Thus, the PRA requires the President to "maintain records documenting the policies, activities, and decisions of his administration," but "leav[es] the implementation of such a requirement in the President's hands." *Id.,* citing 44 U.S.C. § 2203(a). The court underscored that Congress "presumably relied on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations." *Id.* at 290.

The case was remanded to district court but appealed again, prompting the D.C. Circuit to clarify its earlier ruling. This time, the Court of Appeals explained that although judicial review was limited under the PRA, it was not precluded entirely. *Armstrong II*, 1 F.3d at 1293 ("The *Armstrong I* opinion does *not* stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review."). Instead:

> [C]ourts are accorded the power to review guidelines outlining, what is, and what is not, a 'presidential record' under the terms of the PRA. The PRA does not bestow on the President the power to assert sweeping authority over whatever materials he chooses to designate as presidential records without any possibility of judicial review.

*Id.* at 1290.   The court stated that *Armstrong I* only barred judicial review of "creation, management, and disposal decisions" of the President and not "the initial classification of existing materials." *Id.* at 1294.

      2.   The *Armstrong* Decisions Do Not Govern the Question Presented in This Case.

Defendant asserts that the *Armstrong* cases stand for the proposition that there is no judicial review of a president's compliance with the PRA.   Def.'s Mem. in Support of Mot. to Dismiss at 25.   Defendant reads *Armstrong II* as carving out a narrow exception that only permits review of classification guidelines, which are not at issue here. *Id.* at 23.   Plaintiff suggests that *Armstrong II*'s clarification of the first opinion confirmed the availability of judicial review over classification decisions, Pl.'s Opp. at 11–12, and it claims that it seeks permissible review of a decision made by NARA that the audiotapes are not Presidential records, *id.*

The Court notes at the outset that there is broad language in *Armstrong I* stating that the PRA accords the President "virtually complete control" over his records during his time in office.   924 F.2d at 290.   In particular, the court stated that the President enjoys unconstrained authority to make decisions regarding the disposal of documents: "[a]lthough the President must notify the Archivist before disposing of records . . . neither the Archivist nor Congress has the authority to veto the President's disposal decision." *Id.*, citing H.R. Rep. No. 95-1487, at 13 (1978), *reprinted in* 1978 U.S.C.C.A.N. at 5744.   Since the President is completely entrusted with the management and even the disposal of Presidential records during his time in office, it would be difficult for this Court to conclude that Congress intended that he would have less authority to do what he pleases with what he considers to be his personal records.

It is also true, as plaintiff points out, that the court observed in *Armstrong II:* "[t]he *Armstrong I* opinion does not stand for the unequivocal proposition that all decisions made

pursuant to the PRA are immune from judicial review."  1 F. 3d at 1293.  But the actual holding

of the case is much more narrow than this language that plaintiff recites.  In the *Armstrong*

decisions, the D.C. Circuit did not consider the question of whether an individual decision to

exclude private materials from the set of Presidential records transmitted to the Archivist could

be subject to review.  In fact, *Armstrong II* was addressing a concern that too many records were

being classified as Presidential, not too few: "[T]he courts may review guidelines outlining what

is, and what is not, a "presidential record" *to ensure that materials that are not subject to the*

*PRA are not treated as presidential records.*"  *Id.* at 1294 (emphasis added).

    The thrust of the *Armstrong II* opinion was the differentiation between agency records

and Presidential records – not, as in this case, between personal records and Presidential records.

*Id*. at 1292.  The concern underlying the court's analysis in *Armstrong II* was that agency records

that are subject to broader disclosure requirements under FOIA would be treated as Presidential

records and given more limited distribution.  *Id.* at 1292–93 ("Congress sought to provide a clear

limitation on just which materials the President could legitimately assert control over and to

preserve the pre-existing body of FOIA law governing the disclosure of government agency

records.")  It was in addressing that point that the D.C. Circuit explained:

> The *Armstrong I* opinion does not stand for the unequivocal proposition that all
> decisions made pursuant to the PRA are immune from judicial review . . . .
> [W]e held that those decisions that involve materials that are truly presidential
> records are immune from judicial review.  We did not hold in *Armstrong I* that the
> President could designate any material he wishes as presidential records, and
> thereby exercise "virtually complete control" over it, notwithstanding the fact that
> the material does not meet the definition of "presidential records" in the PRA.

*Id.* at 1293–94 (internal citations omitted).  Notably, the D.C. Circuit did *not* insist: "We did not

hold in *Armstrong I* that the President could designate any material he wishes as *personal*

records."   In other words, *Armstrong II* did not announce that there was any limit to the

President's discretion to segregate materials as personal even though it did conclude that the courts could play some role in overseeing the decision to classify agency records as presidential.

Thus, a close reading of the *Armstrong II* decision suggests that the limited judicial review authorized by the  D.C. Circuit  left untouched that portion of *Armstrong I* that gave the President unfettered control over his own documents.  Some of the language in *Armstrong II* led another court in this district to comment that "*Armstrong II* does not necessarily foreclose judicial review of a decision to denominate certain materials 'personal records' of a former President."  *Am. Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1314 (D.D.C. 1995).  While that may be true, the D.C. Circuit has not yet blessed it either.

On a practical level, the possibility of judicial review raises a host of questions.  If it is available, why is the PRA entirely silent on the subject?[3]  What standard of review would

---

3    Although the plain text of the statute is silent about judicial review, defendant argues that the legislative history and purpose behind the PRA support the notion that Congress did not intend for private litigants to be able to challenge classification decisions made by the President.  Def.'s Mem. in Support of Mot. to Dismiss at 32–37.  The predecessor statute to the PRA was the Presidential Recordings and Materials Preservation Act of 1974 ("PRMPA"), which was enacted out of concern that President Nixon might destroy records related to the Watergate Investigation.  *See* note following 44 U.S.C. § 2111; *Nixon v. United States*, 978 F.2d 1269, 1271 (D.C. Cir. 1992).  To prevent this, the PRMPA mandated that the government seize President Nixon's records and promulgate regulations allowing public access to those records.  *See* note following 44 U.S.C. § 2111 at §§ 101, 104.  The controversy over President Nixon's records and whether the PRMPA interfered with his right to privacy in his personal records led to the passage of the PRA in 1978.  *See* H.R. Rep. No. 95-1487, at 5–7, 11 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5737–38 (noting in particular the need "to properly protect a President's privacy interest and his first amendment associational rights"); *see also Nixon v. Freeman*, 670 F.2d 346, 349 n.2 (D.C. Cir. 1982).  Defendants argue that this legislative history shows that "Congress would not have authorized private litigants to obtain judicial review of a President's determination that certain records are personal."  Def.'s Mem. in Support of Mot. to Dismiss at 27.

Defendant also contends that other provisions of the PRA demonstrate Congress's intent to preclude judicial review, particularly, the provision that allows the President to restrict access to certain Presidential records for up to twelve years.  44 U.S.C. § 2204(a).  During that time period, there is no judicial review of that decision.  *Id.* § 2204(b)(3).  If the Court adopted plaintiff's position that personal records could be subject to judicial review at any time, "it would

apply?[4]   Would there not be a high level of deference accorded to a president's decision about which records are personal?   How could a challenge to a president's classification decision be litigated without the decision-maker participating as a party to the lawsuit?   If a classification decision is reviewable, what is the statute of limitation that applies?   And, would that period have expired in this case given that President Clinton has been out of office for over twelve years?

Bearing in mind the *Armstrong* decisions and all of the considerations raised by the parties, the Court has seriously doubts about whether the former President's retention of the audiotapes as personal is a matter that is subject to judicial review.   But the Court need not decide this question because whether judicial review is available or not, the relief that plaintiff seeks – that the Archivist assume "custody and control" of the audiotapes – is not available under the PRA.

## B. Plaintiff's Injury Is Not Redressable by the Court Because the Requested Relief Is Not Available.

To satisfy the redressability requirement of jurisdictional standing, a court must find that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" on the merits.   *Lujan*, 504 U.S. at 561, quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976) (quotation marks omitted).   An injury is not redressable where the "only apparent avenue of redress for plaintiffs' claimed injuries . . . . is unavailable."   *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010).

---

lead to an anomalous consequence that the President's *most* sensitive papers would *immediately* [be] subject to judicial review," while others would not.   Def.'s Mem. in Support of Mot. to Dismiss at 28.   These arguments have some force.

4      At the motions hearing, plaintiff could not begin to answer the Court's question about what the relevant standard of review would be.   Tr. at 58.

The complaint asserts a single claim under the APA, 5 U.S.C. § 701, *et seq.*, alleging that plaintiff has been "irreparably harmed" because "[d]efendant's determination [that the audiotapes are not presidential records] prevents [p]laintiff from gaining access to the audiotapes through FOIA." Compl. ¶ 21.[5]  To redress this injury, plaintiff asks the Court to declare the audiotapes to be Presidential records and, because they are not currently in the government's possession, to compel defendant to "assume custody and control" over them pursuant to the PRA. *Id.* at 5 (prayer for relief).

Plaintiff fails to specify which provision of the APA underlies its claim. Compl. ¶¶ 17–22.[6]  Because the complaint outlines the defendant's failure to act with respect to the audiotapes, including alleged failures to classify the tapes properly and to assume custody and control of

---

[5]     To the extent that plaintiff's claim is premised on the PRA, there is no private right of action under the PRA. *CREW*, 593 F. Supp. 2d at 218. Plaintiff does not contest this. Pl.'s Opp. at 5. Although the Court in *CREW* went on to consider the Vice President's plan for records disposal under a mandamus analysis, that option is not available in this case because President Clinton is no longer a sitting president. *Id.*

[6]     The complaint does not allege that it was arbitrary and capricious for the Archivist to fail to use his discretion under section 2112 of the Federal Records Act to invoke the enforcement mechanism provided in the PRA for retrieving missing Presidential documents.  And at the hearing, plaintiff's counsel underscored that the lawsuit was not premised on these grounds. Tr. at 37, 42, 50.  Even if plaintiff's complaint could be construed to include an implicit APA claim challenging the Archivist's failure to use the tools at his disposal to challenge the President's decision, that claim would not be ripe.  Since no one has asked the Archivist to take such action, there has been no final agency action denying the request.  Furthermore, under the APA, a court cannot review "agency action [that] is committed to agency discretion by law."  5 U.S.C. § 701 (a)(2).  And a court may only compel agency action that is "legally required."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 55 (2004).  The PRA gives complete discretion to the Archivist to determine when to initiate the enforcement mechanism available under the FRA. *See* 44 U.S.C. § 2112(c) ("When the Archivist considers it to be in the public interest, he *may* exercise . . . all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control.") (emphasis added). So, even if plaintiff had predicated this action on §2112(c), there would be no relief available to plaintiff.

them, the Court will construe the claim as one to "compel agency action unlawfully withheld." 5

U.S.C. § 706(1) (2006). As the Supreme Court explained in *Norton v. Southern Utah Wilderness*

*Alliance*, 542 U.S. 55, 63 (2004): "[T]he only agency action that can be compelled under the

APA is action legally *required*." *Id.*; *see also Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C.

Cir. 1987) ("[Where] an agency is under an unequivocal statutory duty to act, failure so to act

constitutes, in effect, an affirmative act that triggers 'final agency action' review.").

> 1. The Court Cannot Compel the Archivist To Reclassify or Retrieve the Audiotapes Because the PRA Does Not Mandate It.

Plaintiff's entire APA claim is predicated on the notion that the Archivist of the United

States has a statutory duty to make his own classification decision and "to assume custody and

control" of all Presidential records. There are a number of flaws with this argument. To begin

with, the plain language of section 2203(f) of the PRA does not say what plaintiff claims it does

– that the Archivist *must* assume custody and control of all materials that fall within the

definition of Presidential records. Tr. at 29:23–30:2. Rather, it states: "the Archivist of the

United States shall assume *responsibility for* the custody, control, and preservation of, and access

to, the Presidential records of that President." 44 U.S.C. § 2203(f)(1) (emphasis added).[7] The

---

7       In its reply brief and at the motions hearing before this Court, counsel for defendant cited *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29 (D.C. Cir. 1983), for the proposition that statutory language requiring the government to "assume responsibility" for something does not create a mandatory duty that can be enforced. Tr. at 62. Defendant argued that in *American Friends*, the court was asked to enforce a statute that gave the agency responsibility to conduct inspections, and that the D.C. Circuit held that those words did not give the agency a responsibility to conduct inspections. *Id.* at 62–63. But that argument does not accurately capture the D.C. Circuit's holding. While it is true that the statute that the court interpreted in *American Friends*, 44 U.S.C. § 2904(c)(7), did confer "responsibility" on the government to conduct inspections, in the section of the opinion on which the government relies, 720 F.2d at 64, the Court of Appeals was actually discussing section 2906 of the statute, which states that an agency "may" conduct inspections. 44 U.S.C. § 2906(a)(1). The Court held that the word "may" does not create a statutory duty – not that language giving an agency responsibility is insufficient to create a duty. *Am. Friends Serv. Comm.*, 720 F.2d at 64.

Court construes this language as requiring the Archivist to take responsibility for records *that were designated as Presidential records during the President's term.* Even plaintiff tentatively agreed that the obligation to assume custody and control arises *after* a determination has been made that the documents are Presidential records. Tr. at 30:3–6. If certain records are not designated as Presidential records, the Archivist has no statutory obligation to take any action at all, and there is nothing to compel under the APA.

In order to accept plaintiff's theory that section 2203(f)(1) of the PRA creates a mandatory duty for the Archivist to assume custody and control of what he or she considers to be Presidential records regardless of how the President designated the documents, the Court would be required to ignore the rest of the PRA's statutory scheme. This it cannot do. *See Chemehuevi Tribe of Indians v. Fed. Power Comm'n*, 420 U.S. 395, 403 (1975) (stating that a statutory provision must be "read together with the rest of the Act").

> Section 2203(a) of the PRA directs the President, not the Archivist, to take:
>
> all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory or other official or ceremonial duties are adequately documented, and that such records are maintained as Presidential records pursuant to the requirements of this section . . . .

44 U.S.C. § 2203(a). The only reference in the entire statute to the designation of records as personal versus Presidential also calls for the decision to be made by the executive, and to be made during, and not after, the presidency. It provides: "materials produced or received by the President, [and other Executive Office employees], shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt and be filed separately." *Id.* § 2203(b). The PRA contains no provision obligating or even permitting the Archivist to assume control over records that the President "categorized" and "filed separately" as personal

records.  At the conclusion of the President's term, the Archivist only "assume[s] responsibility for . . . the Presidential records."  *Id.* § 2203(f)(1).[8]

Plaintiff contends that its factual allegations about the nature and substance of the audiotapes clearly establishes them to be Presidential records, regardless of how they were treated by President Clinton.  Pl.'s Opp. at 12–13.  The Court is not so sure.[9]  But even if the Court were inclined to agree with plaintiff's reassessment of President Clinton's decision, it would not alter the conclusion that the injury cannot be redressed:  the PRA does not confer any mandatory or even discretionary authority on the Archivist to classify records.  Under the statute,

---

[8]     Even plaintiff's counsel seemed to recognize at the hearing that there was no clear statutory duty he could point to:

> THE COURT:  They're required to assume custody and control of the [P]residential records after the [P]resident designates which are which?

> [PLAINTIFF'S COUNSEL]:  *Possibly.*

Tr. at 30 (emphasis added).

[9]     Presidential records are defined as those "documentary materials . . . which relate to or have an effect upon the carrying out of the . . . official or ceremonial duties of the President," 44 U.S.C. § 2201(2), and the statute defines personal records as those materials which do not, *id.* § 2201(3).  Plaintiff's suggestion that a verbatim recording of the President carrying out his duties "relates to" his carrying out of those duties has some force.  But that is not the end of the inquiry.  Section 2201(3)(A) goes on to specify that diaries or their functional equivalent, "which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business" are personal.  *Id.* § 2201(3)(A).  So the classification depends not upon what the tapes contain, but what the President prepared them for and what he did with them. Plaintiff has alleged no facts that would suggest that the tapes were circulated to anyone beyond the former President and the historian, or that they were used (as opposed to generated) in the course of transacting official business.  More important, as plaintiff acknowledged at the hearing, we lack any information about what President Clinton had in mind:

> THE COURT:  How can I make that decision without the information that would really only be in the [P]resident's head, what they were created and utilized for?

> [PLAINTIFF'S COUNSEL]:  Well, that's the problem.

*See* Tr. at 41.

this responsibility is left solely to the President.  44 U.S.C. § 2203(a)–(b).  While the plaintiff

casts this lawsuit as a challenge to a decision made by the National Archives, the PRA makes it

clear that this is not a decision the Archivist can make, and in this particular case, it is not a

decision the Archivist *did* make because President Clinton's term ended in 2000, and the tapes

were not provided to the Archives at that time.  To the extent that there was a subsequent

classification decision the Archivist purported to make, *see supra* note 2, or to be more accurate,

a decision to decline to revisit the President's classification decision, any injury plaintiff claims it

suffered as a result would not be redressable because there is nothing under the statute that the

Court can compel the Archivist to do.[10]

2.  The Sole Enforcement Mechanism Available to the Archivist Is Committed to Its Discretion.

Even if the Court agreed with plaintiff that the PRA authorizes the Archivist to assume

control of materials that fall within the definition of Presidential records regardless of how the

President classified them, and it agreed with plaintiff's questionable characterization of the

materials, the Court still could not order the relief plaintiff seeks because the only enforcement

tools provided to the defendant under the PRA are committed to the agency's sole discretion.

*See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (holding that "an

agency's decision not to prosecute or enforce, whether though civil or criminal process, is a

decision generally committed to an agency's absolute discretion").

---

10  Plaintiff relies heavily on *Judicial Watch, Inc. v. U.S. Dep't of Commerce,* 736 F. Supp. 2d 24 (D.D.C. 2012), for the proposition that it may bring its claims under the APA.  But the facts of that case are inapposite to the present case.  In *Judicial Watch v. Commerce*, defendant was subject to specific statutory obligations under the Federal Advisory Committee Act that were within its power to discharge.  *Id.* at 27.  Here, the Archivist has no statutory powers related to either the reclassification of records or the retrieval of improperly classified records.

The PRA authorizes NARA to invoke the same enforcement mechanism embodied in the Federal Records Act, which begins with a request to the Attorney General to institute an action for the recovery of missing records. *Compare* 44 U.S.C. § 2112(c) *with* 44 U.S.C. § 3106. The statute does not mandate that NARA invoke this enforcement scheme but rather vests complete discretion with the agency to utilize that mechanism. 44 U.S.C. § 2112(c) ("When the Archivist considers it to be in the public interest, he *may* . . . ." (emphasis added). The Archivist has chosen to invoke the mechanism in the past when it deemed such action appropriate. *See, e.g.*, *United States v. McElvenny*, No. 02-3027, 2003 WL 1741422 (S.D.N.Y. April 1, 2003) (seeking recovery of a map of Cuba annotated by President John F. Kennedy during the Cuban Missile Crisis).

Plaintiff argues that defendant never had an opportunity to consider whether to invoke the enforcement scheme because it "erroneously determined that the audiotapes are not presidential records." Pl.'s Opp. at 8. Not only is this argument circular, but it ignores the Supreme Court's guidance in *Heckler v. Chaney* that an agency's assessment of whether a violation has occurred is part and parcel of the decision whether to enforce. 470 U.S. at 831 (stating that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise . . . . [including] assess[ing] whether a violation has occurred"). By asking the Court to order defendant to "assume custody and control" of the audiotapes, plaintiff essentially asks the Court to compel defendant to determine that a violation has occurred and enforce the PRA. This is not permissible under the APA. *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("[Agency] discretion is at its height when the agency decides not to bring an enforcement action.").

3.  <u>Plaintiff's Suggestions Regarding How the Archivist Should Assume Custody and Control of the Tapes are Impractical and Underscore the Lack of Redressability in This Lawsuit</u>.

Because the audiotapes are not physically in the government's possession, defendant submits that it would be required to seize them directly from President Clinton in order to assume custody and control over them.  Def.'s Mem. in Support of Mot. to Dismiss at 1, 15–18. Defendant considers this to be an "extraordinary request" that is "unfounded, contrary to the PRA's express terms, and contrary to traditional principles of administrative law."  *Id.* at 1.  The Court agrees.

Plaintiff attempted to minimize the unprecedented nature of its request by imagining scenarios that would result in an amicable recovery of the tapes from the former president:

> THE COURT:  [Y]ou've asked me to order them to go get them.
>
> [PLAINTIFF'S COUNSEL]:  To an extent. We asked the Court to require them to assume custody and control of [the tapes] . . . . I mean it sounds awful that they think we're asking for this Court to bang down President Clinton's door and seize these audiotapes . . . . [A]rchives could make a phone call, they could write a letter.  There is nothing in the record stating that President Clinton wouldn't just give them the records . . . . We're not specifically saying they have to go seize.

Tr. at 29:7–18.  Plaintiff's indulgence in wishful thinking in order to minimize the ramifications of its own lawsuit underscores the lack of redressability fatal to the case.  It is telling that counsel for plaintiff was repeatedly unable to identify anything specific the Court could or should order the Archivist to do under these circumstances:

> THE COURT:  What does "assume custody and control" mean in your view? What do you want them to do?
>
> [PLAINTIFF'S COUNSEL]:  Because they are also required to make them available to the public, "assume custody and control" would be to take control of the records or have somebody else take control of the records . . . .
>
> THE COURT:  How do they take control? . . . He issues a press release[:]  I've got them . . . . Then what?  What are they supposed to do?

> [PLAINTIFF'S COUNSEL]:  As I said, there are many options.
>
> THE COURT:  Tell me one.
>
> [PLAINTIFF'S COUNSEL]:  One option is they can call President Clinton and ask . . . .
>
> THE COURT:  Okay.  He says no.  Now what?
>
> [PLAINTIFF'S COUNSEL]:  They write a nice letter.  They maybe use one of these enforcement mechanisms.  Maybe they try something else.

*Id.* at 43:18–44:12.  Throughout the hearing, plaintiff remained unable to identify any avenue for

relief or to specify the terms of the order it was seeking:

> THE COURT:  What enforcement mechanism, what thing, what power can they exercise under the statute that I can order them to do that makes your injury redressable?
>
> [PLAINTIFF'S COUNSEL]:  Once the records are determined to be [P]residential records there is an obligation to assume custody and control of them.  How – and I will just say, once again, how they go about doing that – Judicial Watch is not challenging how.
>
> ***
>
> And once the determination is made [that they are] [P]residential records, it opens the door.  It leaves for the possibility that [A]rchives will go out and get the records.  It leaves the possibility that they'll use one of their enforcement mechanisms or they may use other avenues to get them.
>
> ***
>
> THE COURT:  We're talking about very mushy unenforceable orders at this point . . . . I just don't think I could issue an order that says 'try your best.'  Then how would anybody be able to ascertain whether they've complied[?]

Tr. at 48:24–50:24 (internal quotations added).

Ultimately, plaintiff conceded that even an order deeming the materials to be Presidential

records and directing the defendant to make an effort to retrieve them would not bind the former

President to produce them, Tr. at 60:14–20, and it would not make them magically available under FOIA:

> THE COURT:  So even if you win, what do you get?
>
> [PLAINTIFF'S COUNSEL]:  We get the possibility to discuss that when the time comes.
>
> ***
>
> [R]edressability could be [] simply having them declared [P]residential records and then the ability to have the further process under FOIA. You know, there are many different instances where an agency could go out and get records under FOIA.
>
> THE COURT:  This is not one of those . . . . [I]f they don't have them, FOIA doesn't help you.
>
> [PLAINTIFF'S COUNSEL]:  Most likely, yes.

Tr. at 60:22-61:15.  This is the problem at the heart of the lawsuit that requires its dismissal.

> 4.   To the Extent Plaintiff's Claim Relies on FOIA, the Requested Relief is Not Available Under the Supreme Court's Decision in *Kissinger*.

Finally, while plaintiff labels its claim as an action under the APA, the lawsuit arises out of a FOIA request.  Compl. ¶ 12.[11]  In particular, plaintiff alleges that the Clinton Library denied its FOIA request and appeal on the grounds that the tapes were not Presidential records.  *Id.* ¶¶ 13–15.  The complaint also avers that "President Clinton unlawfully retained the requested audiotapes after leaving office."  *Id.* ¶ 16.  Plaintiff asks the Court to order defendant to "assume custody and control of the requested records[,]" "deposit the requested records in the Library[,]" and "process the records pursuant to FOIA."  *Id.* at 5 (prayer for relief).

---

11    Other courts in this district have declined jurisdiction over APA claims that sought remedies made available by FOIA.  *See, e.g., ExxonMobil Corp., v. Dep't of Commerce*, No. 10-250, 2011 WL 6091470, at *9 (D.D.C. Dec. 8, 2011); *Kenney v. DOJ*, 603 F. Supp. 2d 184, 190 (D.D.C. 2009).

To the extent that plaintiff is seeking relief related to the availability of documents under FOIA, that claim is governed by the Supreme Court's holding in *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136 (1980).  In that case, the Court held that FOIA does not give rise to a private right of action to compel an agency to retrieve documents that are not in its possession, even if one assumes that the documents were wrongfully withheld under the Federal Records Act.  *Id.* at 151–52.[12]  The Court explained in that case:  "It is therefore clear that Congress never intended when it enacted the FOIA, to displace the statutory scheme embodied in the Federal Records Act and the Federal Records Disposal Act providing for administrative remedies to safeguard against wrongful removal of agency records as well as to retrieve wrongfully removed records."  *Id.* at 154.[13]  The same reasoning applies here.  There is no indication in the record that Congress intended to supplant the limited remedies available in the PRA with FOIA.

---

12     While *Kissinger* may not control the resolution of plaintiff's claim because this lawsuit was ostensibly brought under the APA and not FOIA, the Court finds the analysis set forth by the Supreme Court to be instructive.

13     In *Kissinger*, the Supreme Court left open the question of what remedies might be available to private plaintiffs under the APA to complain that the government breached a duty to enforce the FRA because no such action was brought in that case.  *Kissinger*, 445 U.S. 136 at 150 n.5.  The Court observes that no such action was brought in this case either.

## CONCLUSION

Thus, because the Court is unable to provide the remedy plaintiff seeks by ordering that defendant "assume custody and control" over the audiotapes, the Court is unable to redress plaintiff's claim.   Accordingly, the Court will grant defendant's motion to dismiss [Dkt. # 6] under Fed. R. Civ. P 12(b)(1) for lack of standing.   A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 1, 2012